THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KAREEM GROVES, Defendant-Appellant.

First District (3rd Division)   No. 1—95—0409

Opinion filed March 12, 1997.

---

Michael Pelletier and Alan D. Goldberg, both of Public Defender's Office, of Chicago, for appellant.

Richard Devine, State's Attorney, of Chicago (Renee Goldfarb, Susan R. Schierl, and Mary Jo Murtaugh, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE COUSINS delivered the opinion of the court:

Defendant Kareem Groves was convicted by a jury of first-degree murder and possession of a stolen motor vehicle. The trial court sentenced defendant to 60 years' imprisonment for the murder conviction, to run concurrently with 7 years' imprisonment for possession of a motor vehicle. On appeal, defendant contends that: (1) he was denied effective assistance of counsel; (2) the prosecutor improperly shifted the burden of proof during closing arguments; and (3) he was denied a fair trial where a judge other than the trial judge conducted the *voir dire*.

BACKGROUND

The State charged Kareem Groves and codefendant Lamont Warren with two counts of first degree murder. The trial court granted Kareem Groves' motion for severance. The trial court also granted defendant's motion to consolidate a separate indictment charging defendant with possession of a stolen motor vehicle. At the jury trial, Deborah Spraggs (Spraggs) testified that, at approximately 2 a.m., on August 3, 1993, she was sitting on the trunk of a parked car in the vicinity of 5538 West Congress in Chicago, talking to a friend, Kareem Williams (Williams). Xavier Jasper (Jasper) drove up while Spraggs and Williams were talking. Jasper stopped his car and talked with them until a policeman directed Jasper to move along. While Williams and Spraggs talked, Spraggs noticed a car pull up and park. The car came from the westbound direction on Congress and parked at a distance of two or three car lengths behind Williams, who was sitting on the front of a car facing Spraggs. Spraggs made an in-court identification of the defendant as the driver of the car. Spraggs stated that the defendant wore a black and blue, short-sleeve, hooded shirt. Defendant called to Williams, "Hey, man." Williams responded, "What's up?" Defendant then walked towards Williams and said, "Ain't you the nigger that chased me the other day?" After Williams responded "No," defendant, standing approximately three feet away, drew a shot gun, cocked it back and said, "Yeah, you was" and shot Williams in the head. Defendant then walked back to the car and entered the driver's side. Spraggs testified that she saw two heads in the back seat of the car defendant was driving. As the victim lay shaking on the ground, Spraggs ran for help.

Spraggs also testified that defendant and a couple of his friends were chased out of the neighborhood by the victim and the victim's cousin just days before the murder. Spraggs also testified that the victim was "associated with" the Four Corner Hustlers street gang,

which is a part of the Vice Lord street gang. Spraggs positively identified defendant in a lineup on the day of the shooting.

Jasper testified that, after he had been told by police to move his car, he parked in front of his house approximately one-half block away from where Spraggs and the victim were talking. While he sat in his parked car talking to a friend, he heard a shot and noticed an oncoming car in his rearview mirror. Jasper testified that the car was an Oldsmobile Cutlass, burgundy in color with no license plates. The car moved westbound until Central Avenue, where it turned left and headed south. Jasper did not see the occupants of the car.

Leon Bentley (Bentley) also testified that he heard gunfire as he left his house at 5518 West Congress. He was the victim's cousin. He testified that a shot came from a westerly direction, a couple of houses down. When Bentley looked down the street, he saw a male with a blue hood and a 12- or 20-gauge shotgun get into the driver's side of the car. Bentley described the car as a burgundy, four-door Cutlass. Bentley also testified that he saw an individual named Darnell Warren (Darnell) in the back seat of the Cutlass.[1] Bentley stated that a few days before the shooting, he and Williams had chased Darnell and two other persons down Congress toward Central Avenue. Bentley testified that Darnell was a member of the Maniac Latin Disciples, a rival gang of the Four Corner Hustlers.

Chicago police detectives Wojcik and Ricco were assigned to the Williams homicide. Pursuant to the investigation, Detective Wojcik spoke to a person named "Tremelle." From Tremelle, police received an address where they could locate defendant. Detectives Wojcik and Ricco, along with Chicago police detective Gawrys, went to 5504 West Congress. After the building manager opened the rear gate, Detectives Wojcik and Ricco went to the front of the building, while Detective Gawrys stayed in the back.

Detective Gawrys testified that, while he was in the back of the building, a car pulled into the alley. Detective Gawrys walked into the gangway and hid against a garage. He saw a maroon Oldsmobile attempting to park in the alley. Detective Gawrys testified that he knew one of the individuals to be Lamont Warren (Lamont) and the driver looked like the defendant. As the driver parked the car, Detective Gawrys could see that the rear window on the driver's side was broken. As the driver exited the car, the detective saw that the steering wheel column was peeled. When the driver got out of the car, he took a bag from the back seat. Detective Gawrys then moved away

---

[1]It appears from the record that when the witnesses speak of Darnell Warren and Donnell Warren, they are speaking of the same person.

from the gangway and went underneath the porch. From underneath the porch, the detective watched defendant drop a bag over the fence at 5504 West Congress and then defendant and Lamont Warren jumped over the fence. After they jumped over the fence, Detective Gawrys announced his office and defendant and Lamont stopped. Detective Gawrys testified that at this point he heard footsteps running away. Detective Gawrys then went back to the car in the alley and saw the column peeled, the window broken, and the trunk lock appeared to have been pulled. After running the license plate, the police learned that the car had been reported stolen. Defendant and Lamont Warren were then placed under arrest. Detectives Gawrys and Ricco drove the suspects to the police station, and Detective Wojcik took the bag and drove the Oldsmobile to the station.

Following an interview with defendant, detectives went to defendant's mother's residence at 3018 West Flournoy, pursuant to a consent-to-search form signed by defendant. Detectives searched defendant's bedroom. Defendant's mother would not authorize any additional search of the premises. No gun was recovered. Gawrys further testified that, on the night of the shooting, Xavier Jasper and Deborah Spraggs viewed a lineup. Jasper made no identification, but Spraggs identified defendant.

Officer Theatrice Patterson, a fingerprint examiner, testified that none of the prints recovered from the car matched those of defendant or Darnell Warren. However, prints from the vent window and the exterior driver's door glass matched those of Lamont Warren.

Detective Wojcik testified that Spraggs was shown various articles of clothing that were taken out of the bag. She identified a hooded shirt and a pair of pants, but said she was not sure about the pants. Detective Wojcik also testified that, at the 25th district parking lot, Jasper identified the Oldsmobile as the car he had seen at the time of the shooting. Spraggs was unable to identify the car. Detective Wojcik subsequently went back to the defendant's apartment building and found an expended 20-gauge shotgun shell in a bush in an empty lot below the landing of the rear porch.

It was stipulated between the parties that, if called to testify, Caesar Torres would testify that he was the owner of the 1980 red, four-door Oldsmobile Cutlass. On August 2, 1993, his car was parked at 2556 West Wabanasia Avenue at 2 p.m., and when he returned to that location at approximately 5 a.m., his car was gone. When Torres identified his car at the police station, the car now had a broken rear vent window, a peeled column, and a punched-out trunk lock.

Officer Treacy testified as an expert in the field of firearms identification. He testified that the fragments found in the victim

were classified as being No. 4 leadshot. He also identified the wadding cup found at the crime scene to be a 20-gauge wadding cup. He testified that the recovered shell was a 20-gauge federal No. 4 shotgun shell.

Defendant's motion for a directed verdict was denied. For the defense, defendant's mother, Alice Groves, testified that defendant stayed at her house three or four times a week. She testified that, on August 3, 1993, at approximately 11 a.m., the police knocked on her front door and told her that they had permission from defendant to search his room. She testified that she saw defendant's signature but saw no address typed on the form. When the police asked her to sign a consent-to-search form, she refused. She also stated that police told her that they were looking for a gold chain that was taken in a robbery. She also testified that the police never told her they were looking for a shotgun or that they were there pursuant to a homicide investigation.

According to defendant's mother, the police did not just search defendant's room, but they also searched the living room, her daughter's room and the heating system in the utility room. She testified that she refused to allow the police to search her room. Ms. Groves further testified that the police took a photograph from her home. She then called the police and spoke to Detective Ricco and asked why it was taken. She testified that, three days later, Detective Ricco came back to her house and returned the photo.

Ms. Groves testified that, at the time of the offense, defendant was at her house. She stated that on August 2, 1993, defendant left the house between 7:30 p.m. and 8 p.m. Defendant returned a little after midnight, and she let him in because she was the only one in the household with a key. She stated that, between the hours of midnight and 3 a.m., she did not notice defendant leave the apartment. She testified that defendant would have had to come past her room to leave through the back door, but not if he left through the front door. According to defendant's mother, she did not go to sleep until 3 a.m.

Ms. Groves also testified that when defendant got home, he took the television from her room and brought it down the hallway into his room. She also stated that she heard defendant talking to her daughter's boyfriend. She awoke at approximately 6 or 7 a.m. the next morning to a knock on the back door. After she unlocked the door, she let Darnell Warren, Lamont Warren and another person whose name she could not recall into the house. The three men sat at the table while Ms. Groves went to wake defendant.

She testified that she saw Darnell Warren and defendant go into

the bathroom. After they left the bathroom, both of them went into defendant's room. Defendant and the other men then went out the back door, and she locked the door behind them. Ms. Groves also testified that she gave defendant a brown plastic bag with a yellow strap for his laundry. She stated that the short-sleeve, hooded shirt was not in defendant's laundry bag. After being shown the shirt that had been identified by Spraggs as the one that had been worn by the shooter, and the pants that had been tentatively identified, Ms. Groves testified that those items did not belong to her son.

Defendant testified on his own behalf. He stated that when he did not stay with his mother, he stayed with his girlfriend at 5504 West Congress. Defendant testified that he was at his mother's house in the early morning hours of August 3, 1993. He arrived there sometime between 11 p.m. and midnight. After defendant arrived at his mother's home, he watched television and talked to his sister's boyfriend until he went to sleep sometime after 3:30 a.m. He testified he did not leave his mother's house until approximately 7 or 8 a.m. He also stated that he did not have a key to his mother's residence.

Defendant stated that, at approximately 7 a.m., his mother woke him after she had let Lamont Warren, Darnell Warren and Tremelle into the back door of the apartment. Darnell Warren wanted to speak with him, so the two went into the bathroom. While in the bathroom, the two counted money and talked. Darnell and defendant then went into defendant's room, where Darnell changed his clothes. Lamont and Tremelle also changed their clothes. Defendant stated that he put his friends' clothes into his laundry bag because he was taking his laundry over to his girlfriend's house. He and his friends left his mother's house at approximately 8 a.m.

Defendant testified that Tremelle drove a maroon Cutlass to defendant's girlfriend's house and that he sat in the back seat. However, on cross-examination, defendant stated that he had never seen the car before. After Tremelle parked the car in the alley behind defendant's girlfriend's house, defendant got out of the car and took the bag of laundry with him. Defendant and Lamont then jumped over the gate. Defendant heard the police yell "freeze." Defendant and Lamont were arrested, but Darnell and Tremelle fled. Defendant stated that, after he was taken to the police station at approximately 9 a.m., he signed a consent-to-search form. He testified that no address was typed on this form when he signed it, but the police told him they wanted to search 5504 West Congress. Defendant testified that he later learned that the police searched his mother's residence.

Defendant also testified that he was a member of the Maniac Latin Disciples and that as part of his membership he sold drugs.

During direct examination, he testified that he was not chased out of the area of Congress and Central by the victim just days before the murder. Defendant also testified that the blue hooded sweatshirt found in the laundry bag did not belong to him.

On cross-examination, defendant testified that he had been a member of the Maniac Latin Disciples for three years. However, he later testified that he had been a member for only one year. He testified that the Maniac Latin Disciples are "folks" and that their colors are black and dark blue. He denied holding any rank in his gang. He also testified that Darnell was a member of the Gangster Disciples and that they are also "folks." Defendant stated that he had heard of the Vice Lords gang and that he knew they were "people." However, he testified that he had never heard of the Four Corner Hustlers, the victim's alleged gang affiliation.

When asked about his drug-selling activities, defendant testified that he made $3,500 a day selling marijuana. He testified that he would work a few days and let the money build to roughly $6,500 and then hide it in a garage located by an abandoned house on North and Talman Avenues. Defendant acknowledged he was involved in a risky business, but he testified that he did not carry a weapon. He sold drugs all around the northwest side approximately three or four times a week.

Defendant also testified that he and Darnell sold drugs together. Darnell supplied him with the marijuana, which was already packaged in seven- or eight-ounce portions. He typically sold an ounce of marijuana for $10. Defendant stated he was familiar with guns and knew the distinction between revolvers and automatics, but he did not know anything about rifles. He also stated that he knows approximately 75 Maniac Latin Disciples, but he did not know of any that carried a gun, although he had heard that some do. Defendant stated that he never sold drugs at Central and Congress.

Defendant testified that when his friends came over to his mother's house on the morning of August 3, 1993, he gave them some of his dirty laundry to change into and he put their clothes into his bag of laundry.

The State offered the rebuttal testimony of Detective Wojcik. He testified that defendant's mother stated that she saw defendant before she went to sleep at approximately 10:30 p.m. or 11 p.m. on August 2, 1993. Defendant's mother also stated she was awakened at approximately 6:30 a.m. when defendant left through the back door. He also testified that the police only searched defendant's room.

Detective Ricco testified that he never took the photograph of defendant and two others that was on the buffet in the living room of

defendant's house and never met with defendant's mother to return any such photo.

Following trial, the jury found defendant guilty of first-degree murder and possession of a stolen motor vehicle. After a hearing in aggravation and mitigation, defendant was sentenced to 60 years' imprisonment for murder to run concurrently with 7 years' imprisonment for possession of stolen motor vehicle. Defendant appeals.

We affirm.

ANALYSIS

I

Defendant first contends that he was denied his right to the effective assistance of counsel during several stages of trial. First, defendant argues that defense counsel improperly introduced evidence of other crimes, thereby prejudicing the defendant. The State argues that defense counsel's introduction of the evidence was a strategic tactic to lend credibility to defendant's theory of the case.

■ To prevail on a claim of ineffective assistance of counsel, a defendant must meet both prongs of the *Strickland* test. See *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)) (which was adopted by Illinois in *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984)). First, counsel's performance must fall well below an objective standard of reasonableness. *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Albanese*, 104 Ill. 2d at 525. Second, even if the defendant meets the first requirement, *Strickland* requires a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; *Albanese*, 104 Ill. 2d at 525-27. When applying the *Strickland* standard, a court is to view the totality of counsel's conduct in light of all the circumstances. *People v. Jackson*, 195 Ill. App. 3d 104, 119, 551 N.E.2d 1025 (1990). The failure to satisfy either prong is fatal to a claim of ineffective assistance of counsel. *People v. Randle*, 277 Ill. App. 3d 788, 796, 661 N.E.2d 370 (1995). To establish that counsel was deficient, the defendant must overcome the strong presumption that the challenged action or lack of action might be the product of sound strategy. *Randle*, 277 Ill. App. 3d at 797; *People v. Martin*, 271 Ill. App. 3d 346, 648 N.E.2d 992 (1995).

■ Specifically, defendant argues that defense counsel was incompetent by allowing the defendant to testify that he sold drugs for a gang, allowing the State to conduct a "mini-trial" on his drug-selling activities. The State maintains that defense counsel intention-

ally introduced evidence of defendant's drug dealing in an attempt to persuade the jury to believe that defendant was a drug dealer but not a murderer. The State further maintains that the introduction of drug-dealing evidence allowed defendant to provide a reasonable, alternative theory of his relationship with Darnell Warren, who was implicated in the murder.

In the instant case, we believe that defense counsel's allowance of evidence of defendant's drug sales was trial strategy. Defense counsel's strategy is evident through his statements during closing arguments:

"My client is a drug dealer. He's a drug dealer; okay? He's a dope dealer. He's not a murderer; okay? Is that the way we're going to think as jurors? Okay, because Mr. Groves sells dope, that he also kills people?

\* \* \*

Okay. The bottom line is this. Is that whatever you may think of him, okay, as a drug dealer, all right, that does nothing to say anything to you about whether or not he committed the offense in question; okay? It goes to his credibility as a witness. That's all it does."

It is apparent that defense counsel's trial strategy was to focus the jury's attention on defendant's drug sales instead of the murder and to disclose defendant's own wrongdoing to lend more credibility to his theory of the case. We do not believe that this strategy was unreasonable or prejudicial to the defendant.

■ Defendant also argues that defense counsel's motion to consolidate his indictment for possession of a motor vehicle with the murder indictment demonstrated ineffective assistance of counsel. The State argues that counsel's decision to consolidate the indictments was trial strategy since the stolen car was tied to the murder and the defendant.

Defendant asserts that defense counsel incorrectly assumed that the State would be able to introduce evidence of the possession-of-a-stolen-motor-vehicle offense because it bore on the circumstances of the defendant's arrest. Defendant is correct that our supreme court in *People v. Richardson*, 123 Ill. 2d 322, 528 N.E.2d 612 (1988), held that evidence is not admissible merely to show how the investigation unfolded and how the defendant came into custody. However, we do not believe that defense counsel was mistaken in believing that evidence of the stolen vehicle was admissible to show the circumstances of defendant's arrest. Although the State commented that it did not plan to reveal the time or date that the car was stolen, the events in this case established that the stolen car was used in connection with

the commission of the offense. Evidence regarding the identification of the car and evidence that the car was stolen was relevant and admissible in the instant case. We believe that defense counsel's motion to join the offenses was reasonable trial strategy.

Moreover, we do not believe that the defendant was prejudiced by the joinder of the offenses. The admission of evidence of other crimes is admissible where the evidence is also relevant to specifically connect the defendant with the crime for which he is being tried. See *People v. McKibbins*, 96 Ill. 2d 176, 449 N.E.2d 821 (1983); *People v. McCray*, 273 Ill. App. 3d 396, 653 N.E.2d 25 (1995). In the case *sub judice*, Spraggs testified that she witnessed the defendant exit the driver's side of the car and shoot Kareem Williams. The stolen car was identified by Jasper and Bentley as having been driven away from the murder scene. Detective Gawrys testified that, after the shooting, he saw defendant exit the driver's side of a car fitting the description given by Jasper and Bentley. Based on the testimony of the witnesses, we believe that the evidence regarding the stolen vehicle was relevant to specifically connect defendant to the murder for which he was on trial and was not offered merely to show how defendant came into custody.

## II

■ Defendant next contends that the prosecutor's comment during closing argument shifted the burden of proof upon the defendant when he stated:

> "You know, ladies and gentlemen there's an old adage that goes around this court building, and the adage is, if you don't have the evidence, argue reasonable doubt. And if that doesn't work, argue police fraud, and if that doesn't work, argue mistake, and if that doesn't work, it's another guy. Well, counsel has to do all those things because all roads lead to Kareem Groves."

The State argues that this argument has been waived because defendant failed to object to the remarks and failed to preserve this issue in a post-trial motion. We agree. To properly preserve an issue for appeal, both a trial objection and a written post-trial motion are required. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1130 (1988).

Even assuming *arguendo* that the plain error exception to the waiver rule applies here, defendant's contention must still fail. It is fundamental that every defendant has the right to a trial free from improper prejudicial comments or arguments by the prosecutor. Whether a prosecutor's comments or arguments constitute prejudicial error is evaluated according to the language used, its relation to the evidence, and the effect of the argument on the defendant's right

to a fair and impartial trial. *People v. Pasch*, 152 Ill. 2d 133, 184, 604 N.E.2d 294 (1992). On the other hand, the prosecutor is allowed a great deal of latitude in making his opening statement and closing argument. *Pasch*, 152 Ill. 2d at 184. He has a right to comment on the evidence and draw all legitimate inferences deducible therefrom, even if they are unfavorable to the defendant. *Pasch*, 152 Ill. 2d at 184. Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks made, the regulation of the substance and style of the opening statement or closing argument is within the trial court's discretion. *Pasch*, 152 Ill. 2d at 184-85. Although the prosecutor's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused, such that absent those remarks the verdict would have been different. *Pasch*, 152 Ill. 2d at 185. The trial court's determination of the propriety of the remarks made will not be disturbed absent clear abuse of discretion. *Pasch*, 152 Ill. 2d at 185.

In the instant case, we do not believe that the prosecutor's comment rose to the level of impermissible burden shifting; rather, the prosecutor commented on the evidence and the reasonable inferences to be drawn from the evidence. Furthermore, other instructions given to the jury informed it of defendant's presumption of innocence, the State's burden of proof and that closing arguments were not evidence. In light of the entire record, the complained-of comments could not have been a material factor in defendant's conviction.

### III

■ Lastly, defendant contends that the trial judge's failure to preside at the *voir dire* of the jury was a violation of due process and the right to a fair trial. Prior to trial, Judge Thomas Hett announced that he had a sore throat which prevented him from selecting the jury. Judge Hett told the parties that he had secured the services of either or both of two judges who were willing to pick the jury, and the next day he would preside over the trial. Defense counsel objected, stating that "the defense wants some continuity between the jury selection and the process of the trial. I don't feel it can be had having a different judge pick the jury and coming to you to try the case." Judge Hett noted the defense objection but ruled that the case would be transferred *instanter* to Judge Karnezis and that Judge Karnezis would conduct the selection of the jury. Judge Karnezis then proceeded to conduct jury selection.

The State initially argues that defendant has waived review of

the Judge Hett's absence from *voir dire*. The State points out that, although defendant objected to Judge Hett's absence of trial, he did not raise an objection in a post-trial motion. As stated earlier, a defendant must object to alleged errors at trial and include the objection in a post-trial motion in order to preserve an issue for appellate review. *Enoch*, 122 Ill. 2d at 186. Defendant argues that this argument cannot be waived because Judge Hett's absence from the *voir dire* implicated the integrity and reputation of the judicial process and resulted in *per se* reversible error.

As a general rule, a judge cannot finish the performance of a duty already entered upon by his predecessor where that duty involves the exercise of judgment and the application of legal knowledge to, and judicial deliberation of, facts known only to the predecessor. For example, in *Durden v. People*, 192 Ill. 493, 61 N.E. 317 (1901), on which defendant relies, the trial judge, after presiding over the trial up to and including a portion of defense counsel's closing argument, absented himself from the proceedings and did not return until the hearing on the motion for a new trial. Without prior notice to the parties, another judge presided over the proceedings during the interim period. In holding that the presiding judge's absence from the proceedings required an automatic reversal of defendant's conviction, the court observed that, because a single judge had presided over most of the trial, that judge's absence may have created a negative impression in the minds of the jurors. *Durden*, 192 Ill. at 507.

Most recently, our supreme court has addressed the issue of substitution of judges in *People v. Vargas*, 174 Ill. 2d 355, 673 N.E.2d 1037 (1996). In *Vargas*, the trial judge briefly excused himself from the courtroom to answer a phone call during defendant's cross-examination of an assistant State's Attorney. Although the defendant had not preserved this error for review, the court elected to review the issue under the plain error rule. The court noted two policy concerns to support its view that the trial judge's absence from the bench was reviewable under the plain error rule. First, the court stated that a judge's active presence on the bench during a criminal trial is an essential safeguard which aids in providing a defendant with a fair trial. Second, a judge's absence from the bench might unduly influence the attitude of jurors so as to deny defendant an impartial trial. Based on these policy reasons, the court held that the trial judge's total absence from defendant's murder trial had to be viewed as so detrimental to the integrity and reputation of the judicial process as to constitute plain error and require reversal for a new trial. For similar policy reasons, the court also held that total

judicial absence for a portion of a felony trial is *per se* reversible because such error is inherently prejudicial, not only to defendant's right to a fair trial, but also to the integrity of the judicial process. *Vargas*, 174 Ill. 2d at 366.

Defendant urges us to promulgate a bright-line rule that substitution of a judge during any stage of a trial, including *voir dire*, is *per se* reversible error. We decline to do so. As stated in *Commonwealth v. Thompson*, 328 Pa. 27, 195 A. 115 (1937), the leading case on this issue, the examination of jurors under *voir dire* does not elicit any information that can be used in the trial of the case. Such examination is merely for the purpose of securing a competent, fair, and unprejudiced jury. That function can be performed properly by any judge. *Thompson*, 328 Pa. at 31, 195 A. at 118.

Moreover, at oral argument, the defendant directed the court's attention to *People v. Blommaert*, 184 Ill. App. 3d 1065 (1989). In *Blommaert*, the appellate court disagreed with the contention of the defendant that the trial court erred when the judge who presided at trial arranged to have another judge substitute for him for the purpose of instructing the jury as to the law. The substituting judge had responded to the request of jurors that certain exhibits be provided to the jury for further review. *Blommaert*, 184 Ill. App. 3d at 1076.

The attorney for the defendant in the instant case argued that *Blommaert* case is no longer law because of *Vargas*. We disagree. We hold there is no bright-line rule that substitution of a judge during any stage of a trial, including *voir dire*, constitutes reversible error. We do not believe that defendant suffered any prejudice in the instant case. Here, there was a trial judge present at all stages of the trial. Judge Hett was present during all trial proceedings to hear the testimony of witnesses and opening and closing arguments. Furthermore, the parties, as well as the jury, had prior notice of the judge's absence and the substitution of judges for the sole purpose of conducting the *voir dire* of the jury. In light of these circumstances, we do not believe that the trial court's absence at the *voir dire* jeopardized the jury's impression of the court, the seriousness of the judicial process, or the impartiality of the jurors.

■ Defendant also asserts that this issue should not be waived because the failure to include the issue in a post-trial motion is another instance of ineffective assistance of counsel. In light of our holding that defendant has not been prejudiced by Judge Hett's absence during *voir dire*, this assertion must fail because it does not meet the second prong of the *Strickland* test.

■ Defendant also contends that he was prejudiced by Judge

Karnezis' failure to read the possession-of-a-stolen-motor-vehicle charge to the prospective jurors. Due to the absence of Judge Hett, defendant moved to have the possession-of-a-stolen-motor-vehicle charge joined with the murder charge. Judge Karnezis declined to rule on the motion, preferring to defer the ruling to Judge Hett. Judge Karnezis then refused to read the stolen-motor-vehicle charge to the jury. However, on the next day, Judge Hett allowed the motion and then read the charge to the jury. Defendant argues that, as a result of the failure to inform prospective jurors of the stolen-motor-vehicle charge prior to *voir dire*, the defense lost the opportunity to ascertain whether any of the jurors would be biased against the defendant because of the pendency of this charge.

The purpose of *voir dire* examination is to provide counsel with the opportunity to determine whether the minds of prospective jurors are free from bias and prejudice, and the limitation of such examination constitutes reversible error where its effect is to deny a party a fair opportunity to probe an important area of potential bias or prejudice among prospective jurors. *People v. Green*, 282 Ill. App. 3d 510, 668 N.E.2d 158 (1996); *People v. Mitchell*, 121 Ill. App. 3d 193, 194-95, 459 N.E.2d 351 (1984).

In the instant case, we do not believe that defendant was prejudiced by the failure of Judge Karnezis to question prospective jurors on the specific charge of possession of a stolen motor vehicle. We believe that the questions asked provided an opportunity for the parties to determine whether or not a juror had a bias against this charge. In fact, when asked: "Have you or any member of your family been the victim of any crime?" one prospective juror responded that his parents' car had been stolen. However, he further stated that he was not prejudiced by this and, in fact, was later impaneled as a member of the jury.

■ Defendant also argues that he was prejudiced by Judge Karnezis' failure to warn the jurors to avoid media reports of the case and not to speak to other persons or to each other about the case. We do not believe that this failure resulted in any prejudice to the defendant. The only information the jury had at that time was the name of the defendant, the charge, and the case number. No evidence had been presented. Also, there is no evidence in the record that media publicity was a concern for this trial. Moreover, subsequent to the commencement of the trial, the trial judge admonished the jury each time that it was dismissed.

For the foregoing reasons, the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

CAHILL and LEAVITT,[2] JJ., concur.

---

[2]Justice Leavitt was not present at oral argument. However, he has read the briefs and record on appeal filed with this court and has otherwise fully participated in the disposition of this case.