FIFTH DIVISION

   May 23, 2003

1-00-4196

THE PEOPLE OF THE STATE OF ILLINOIS, )  Appeal from the 

                                     )  Circuit Court of

       Plaintiff-Appellee,           )  Cook County.

                                     )

                                     )

              v.                     )                                                                  )

                                     )

RONALD WEMBLEY,                      )  Honorable

                                     )  Colleen McSweeney-Moore

       Defendant-Appellant.          )  Judge Presiding.

JUSTICE QUINN delivered the opinion of the court:

Following separate jury trials, defendant, Ronald Wembley (defendant), and Roosevelt Stevens (codefendant), were both convicted of first degree murder. 720 ILCS 5/9-1(a)(1) (West 1998).  The trial court sentenced defendant to 45 years in prison.  This appeal followed.

On appeal, defendant argues that he was denied a fair trial because: (1) the trial court questioned his venire en masse and asked potential jurors to defer their questions; (2) the judge who conducted the 
voir
 
dire
 was different from the judge who presided over the trial; (3) the State made improper closing arguments; and (4) the trial court erred in considering a void prior conviction in sentencing defendant.  For the following reasons, we affirm defendant's conviction and sentence.

BACKGROUND

Defendant and codefendant were both tried before Judge McSweeney-Moore for the first degree murder of Tyree Williams.  There were two juries, one for the defendant and one for the codefendant.

On September 7, 2000, Judge Sacks conducted the 
voir
 
dire
 for Judge McSweeney-Moore for the impending trial of the defendant. Judge Sacks instructed the venire members en masse about the  requirements in Supreme Court Rule 431(b)(177 Ill. 2d R.431(b)) and 
People v. Zehr
, 103 Ill. 2d 472 (1984), that: (1)the defendant was presumed innocent of the charges against him; (2) the defendant could only be convicted of the charged crime if the State proved the defendant guilty beyond a reasonable doubt; (3) the defendant was not required to present any evidence of his innocence;  and (4) the defendant's failure to testify could not be held against him.  During the 
voir
 
dire
, Judge Sacks asked the venire persons: whether or not any person knew the defendant; whether anyone had "any difficulty following the law about the presumption of innocence and proof beyond a reasonable doubt"; whether anyone had a problem with "the State has the burden of proof beyond a reasonable doubt"; whether "anyone in the courtroom serve[d] on a jury within the last year"; whether anyone had any "physical, emotional infirmities that would prevent [him/her] from serving on the case."  When a venire person raised his/her hand in response,  Judge Sacks would tell the person that he would discuss the question when the venire person was called as a potential juror.  Defense counsel raised no objections.

After addressing the entire venire, Judge Sacks questioned each juror individually.  During individual questioning, Judge Sacks asked each and every potential juror whether he or she could be fair and impartial.  Each of the venire members who eventually was picked as a juror answered affirmatively to the question.  Judge Sacks also asked every venire member but two who later became jurors in this case whether they had raised their hands in response to the earlier questions.  They all answered in the negative.  However, Judge Sacks did not ask jurors Elizabeth Hall and Sally Sellers whether they had raised their hands earlier.

During 
voir
 
dire
, the State attempted to use a peremptory challenge to exclude juror Sally Sellers and defense counsel objected.  After hearing arguments from both parties, Judge Sacks denied the State's peremptory challenge.  Sally Sellers served as a juror in this trial.  After a jury was selected, the jurors reported to Judge McSweeney-Moore for the trial.

Steven Williams (Steven), the victim's brother, testified  that he was serving a 10-year sentence for aggravated vehicular hijacking and possession of controlled substance with intent to deliver.  Steven testified that on April 18, 1998, he and Tyree drove their aunt's red Cavalier to Stateway Gardens to look for girls.  Stateway Gardens is a public housing complex located at 35th and South State Streets.  The buildings comprising the Stateway Gardens were controlled by the Gangster Disciples (GD's) or the Black Disciples (BD's), rival street gangs.  After conversing with two girls at the complex, they left.  As Tyree was driving down a fire lane, Steven saw Ronald Wembley (defendant) raise a gun and aim at them.  Seeing this, Steven urged Tyree to drive into a playground to escape.  Steven testified that when the car was in the basketball court, the defendant fired a shot which hit their car.  The bullet penetrated the car's trunk and hit Tyree in the elbow.  After being shot, Tyree lost control of the car and crashed into a parked car.  After the crash, Tyree and Steven tried to escape on foot.  As they were fleeing, about 10 to 15 GD's caught them and dragged Steven into a building and beat him.  Steven escaped with minor injuries because Black Disciple members came to his rescue.  Meanwhile, other GD's caught Tyree and dragged him to the side of a building to beat him.  After escaping, Steven went to look for Tyree and found him lying dead beside a building.  Steven stayed by his brother until the police arrived.  He gave the police the names of the defendant and another Gangster Disciple (GD's) who had jumped him and Tyree.

On April 19, 1998, Steven went to the police station to view a lineup.  Steven identified Roosevelt Stevens (Stevens) as one of the GD's who dragged Tyree away.  Steven also identified the defendant in a photo array as the person who fired the shot into the car that hit Tyree's elbow.

Antwone Lee (Lee) testified that he and the defendant were both GD's.  Lee testified that the GD creed was to "aid and assist" any GD under any circumstances.  If a GD did not follow this rule, the GD would be "violated."  "Violated" means the GD would be beaten, punched and kicked by fellow gang members. Lee further testified that the first rule of the GD was "silence and secrecy," which means no outsider is privy to GD business.  The punishments for the violation of this rule range from a five-minute beating in the face with the hands tied behind the back to being killed by other GD's.

Lee also testified that GD's had to do security duty.  While on security duty, the GD's would carry handguns.  Lee testified that he had seen defendant carry a 44 Magnum silver handgun 10 to 15 times while defendant was carrying out security duties.

Prior to joining the GD's, Lee had been a member of a rival street gang, the BD's, for three years.  On April 18, 1998, he was playing basketball with his fellow gang members, Stevens, Arthur Pinex (Pinex), B.B., Tiny, Mute, and several other GD's.  In fact, all the people on the basketball court were GD's.  Lee testified that as he was playing ball, defendant approached them with the 44 Magnum handgun sticking out of the pocket of his jacket.  Defendant then told them "if we hear shots, don't worry, they [are] coming from him because he just saw 2 boys from DuSable High School that were [BD's] that [had] jumped on him."  After informing the other GD's, defendant then went to the corner of the 3519 building to wait for the red Cavalier.  Lee further testified that he saw a red Cavalier driving down the fire lane, approaching the 35th Street exit.  As the car passed the basketball court, the GD's stopped the game to let the car pass.  
Lee testified that he saw defendant firing a "big silver gun" at the red Cavalier.  After the shots, the red Cavalier lost control and crashed into a parked car.  Lee testified he saw the victim and Steven jump out of the car and start running.  At this time, defendant yelled at the GD's on the basketball court, "folks, catch them bitches."  The GD's are members of a group of gangs that call themselves "folks."  

The GD's chased the victim and Steven.  Lee testified that Stevens caught Steven and along with other GD's dragged Steven inside a building to beat him.  Lee also testified that Pinex and several other GD's caught the victim and dragged him to the side of the building.  Pinex knocked the victim unconscious.  Lee himself then kicked the victim several times.  After kicking the victim, Lee walked away.  As Lee was leaving, he saw another GD, Haynes, run up to the victim with a small black pistol, stand over the victim and fire five shots into him.

On May 1, 1998, along with his mother, Lee went to the police station to confess his participation in the crime.  Lee was arrested and charged with the murder of the victim.  Later, through his lawyer, Lee agreed to testify for the State in this trial, and in return, the State recommended that Lee serve a sentence of 20 years for the murder.

Chikira Parker, 16, testified that on April 18, 1998, she lived in Stateway Gardens.  Parker testified that she knew Haynes and Lee and that she was with Samantha Finley on the day of the shooting.  They were talking to the victim and his brother.  Parker further testified that she saw the victim drive down the fire lane and saw defendant stop the victim's car.  She also saw defendant say something to Steven, heard a gunshot, and saw a gun in the defendant's hand.  After the gunshot, Parker saw the victim's car crash into another car.  Parker saw Stevens grab Steven out of the car.  Stevens then dragged Steven inside a building.  Parker also testified that as Steven was being dragged away, she saw Lee and Haynes drag the victim to the side of a building.  Lee then started beating the victim.  Parker heard two gunshots.  Parker saw defendant and Haynes standing by the victim and Haynes had a gun in his hand.

Parker testified that gang crimes police officer Milton Seaton tried to talk to her at the homicide scene. Parker refused to talk to Officer Seaton at that time because she was afraid that the GD's would retaliate against her. Officer Seaton then asked Parker to meet him in a nearby school. Once there, Parker told Officer Seaton what happened.  Parker viewed a photo array in the police station and identified defendant as the person who shot at the victim's car.  Parker also identified Haynes as the person who had a gun in his hand when the victim was shot at the side of the building.  The day after the shooting, Parker went to the police station to view a lineup.  She identified Stevens as the person who beat up Steven Williams.  Parker stated that Samantha Finley was with her throughout the entire incident.

Samantha Finley testified that she was 17 years old and lived at 3618 South State Street on the day of this incident.  On the day of the trial, Finley was still living at the Stateway Gardens.  Finley testified that she knew Steven and Tyree Williams.  She knew that Steven was a BD; however, the victim had no gang affiliation.  She also knew Stevens and Haynes were both members of the GD's.  Finley testified that she talked to the victim and Steven prior to the shooting.  After the conversation, she went home and then to a shopping mall.  Finley testified that when she returned from the mall, Parker told her what had happened to Tyree and Steven.  Finley denied witnessing the murder.  Finley testified that Officers Seaton and Kimble interviewed herself and Parker after the shooting.  In this interview, Finley repeated Parker's account of the events to the police officers.

During trial, the State introduced evidence that Finley had testified before a Grand Jury several days after the shooting.  In the Grand Jury proceeding, Finley testified that she saw the victim drive down the fire lane.  The victim drove off quickly as someone approached the car.  Meanwhile, she saw Tyrell Foster box the victim in with a white car.  As the victim was boxed in, Finley saw the defendant, Bobby Ellis, Lee, Stevens and Haynes approach the victim's car.  As the GD's approached the victim's car, she saw the defendant, Lee and Haynes pull the victim out of the car, drag him to the side of a building and beat the victim for about five minutes.  She also saw Stevens and Ellis grab Steven Williams out of the car and drag him into a building.  Finley also testified that she saw Stevens and Lee had guns on them, but she did not see them shoot their guns.

Chicago police officer Dennis Stenkus testified he was a forensic investigator, and on April 18, 1998, he received a call and went to the homicide scene.  As Officer Stenkus arrived at the scene to collect evidence, he saw a bullet hole in the trunk of a red Cavalier.  There were also bullet holes in the backseat and in the dashboard of the red Cavalier.  Officer Stenkus testified that all the bullet holes appeared to be along the path of a single bullet.  However, Officer Stenkus did not recover any spent bullet or shell casing on the scene.

Chicago police gang crimes officer Milton Seaton testified that on April 18, 1998, he was called to a homicide scene at Stateway Gardens with his partner, Officer Ronald Kimble.  When Officer Seaton arrived at the scene, the victim was already dead.  He then tried to collect evidence and interview witnesses.  He saw Parker and Finley near the crime scene.  Officer Seaton questioned both Parker and Finley, who indicated that they saw what transpired but refused to talk to the police on the scene.  Officer Seaton arranged to meet Parker and Finley behind a nearby school.  In that meeting, Finley told Officer Seaton that she saw Stevens and Lee drag Williams out of the red Cavalier.  The victim was dragged out of the car by the defendant and Haynes.

The next day, Officer Seaton arrested Stevens at the basketball court located at 3542 South State Street.  On April 26, 1998, Officer Kimble apprehended the defendant at 4844 South State Street. With permission, Officer Kimble searched defendant's apartment and recovered a .44-caliber handgun.

Illinois State Police forensic scientist Karen Heard testified she received 11 fingerprints taken from the victim's car by Officer Stenkus for comparison.  Seven of the fingerprints belonged to Steven Williams.  The other fingerprints did not match with anyone involved in this murder.  Heard also testified that a fingerprint recovered from the barrel of the .44 caliber handgun belonged to the defendant.

The victim's aunt, LaTonya Dandridge, testified that on the day of the shooting, the victim was driving her red Cavalier.  After the police investigation, Dandridge took the car to a garage for repair.  The mechanic recovered a bullet from the radiator which Dandridge took to the police.

Doctor Edmund Donoghue, the chief medical examiner, testified that he performed the autopsy on the victim.  He found four gunshot wounds on the body.  The first and second gunshot wounds were inflicted on the victim's skull; the third bullet wound was on the back; the fourth wound was on the victim's right elbow, and there was an exit wound on his right arm.  Dr. Donoghue further testified that the victim had many other injuries to his body.  However, those injuries were not inflicted by a firearm.  Dr. Donoghue opined that the victim's death was caused by the multiple gunshot wounds and the manner of death was homicide.

Illinois State Police forensic scientist Laura Fleming  testified as a firearm expert.  Fleming testified that the three bullets recovered from the victim's body were fired from the same gun.  However, these three bullets were not fired from the .44- caliber handgun found in the defendant's apartment.  She also testified that the bullet recovered from the Cavalier's radiator was not suitable for microscopic comparison.

Assistant State's Attorney, Geraldine D'Souza testified that after an interview, the defendant signed a handwritten statement about the shooting.  In his statement, defendant related that on the day in question, he was on the sixth floor of the building located at 3519 South Federal Avenue when he heard gunshots.  The defendant took his .44-caliber handgun, checked that it was loaded, and went downstairs to see whether any GD needed assistance.  There were three bullets in his gun.  As defendant was outside the building, he saw two men in a red Cavalier.  The defendant told his fellow GD's that the BD's were there to cause trouble.  Defendant said that neither the victim nor Steven Williams threw any gang signs, nor was the victim armed.  The defendant said that he then took his gun out, pointed at the red Cavalier, and fired one shot.  He did not know whether he hit the car.  In the confession, the defendant stated that as he shot at the red Cavalier, he knew he might hurt or kill one of the persons in the car.  After the shot was fired, the red Cavalier hit a pothole and swerved into a parked car.  After the crash, the victim and Steven fled.  Defendant then saw several GD's who chased, caught and dragged the victim and Steven to the 3544 South State Street building.  Seeing the two persons being dragged away, defendant then gave his gun to another GD and asked him to hide the gun behind the door on the thirteenth  floor.  The defendant then went to visit a friend.  While there, a GD came to tell the defendant that one of the men in the red Cavalier was killed.  Defendant went out to the balcony and saw someone lying under a white sheet.  The police were on the scene.  Two days later, the defendant asked the same GD who hid his gun to retrieve it for him.  Defendant also said that the gun that the police found in his apartment was the same gun that he used to shoot at the red Cavalier.  Defendant stated he was not coerced by the police or the assistant State's Attorney into writing his confession.

The People rested.

Defense counsel called Assistant State's Attorney (ASA), Dan Groth to testify.  ASA Groth testified that he took a written statement from Antwone Lee after his arrest.  In Lee's statement, he did not say that the defendant came to the basketball court and tell everybody that "if we hear shots, don't worry, they [are] coming from him because he just saw two boys from DuSable High School that were BD's that [had] jumped on him."  Instead, Lee said that someone yelled something like "get their ass, grab them."  However, Lee did not say who said it.

Defense counsel also called Chicago police detective James Cassidy.  Detective Cassidy testified that he interviewed Chikira Parker after the shooting.  Parker told Detective Cassidy that the defendant fired a shot and that Haynes was the person who shot the victim as he was lying on the ground.  However, Detective Cassidy did not recall whether Parker said that the defendant fired a shot at the car or at the victim.  The police report did not reflect that Parker saw anyone shoot at the car.

The defense rested.

During closing argument, the State argued that Samantha Finley recanted her grand jury testimony because she was still living in the Stateway Gardens and she was afraid to testify against any GD  The State also argued that defendant and his gang had scared off other potential witnesses from testifying. The State further argued that defendant was a high-ranking GD member. The defense counsel objected to this statement, and the trial court sustained the objection.  Finally, the State urged the jury to return a guilty verdict to send a message to the street gangs that infested Stateway Gardens.

After deliberation, the jury returned a guilty verdict of first degree murder.  The trial court sentenced defendant to 45 years in prison.

ANALYSIS

VOIR
 
DIRE

On appeal, defendant argues that he was deprived of a fair and impartial jury trial because Judge Sacks questioned the venire members en masse and deferred answering questions from potential jurors.

In this case, defendant did not raise an objection when Judge Sacks asked the prospective jurors who had raised their hands to defer their questions.  Judge Sacks invariably offered a general reply like, "If you happen to get in the [jury] box later on*** tell me what you want to talk about and then we'll talk about it then."  Further, this issue was not included in defendant's post-trial motion. As such, this issue would normally be deemed waived.  
People v. Enoch
, 122 Ill. 2d 176, 186 (1998).  However, defendant urges this court to apply the plain error rule to review this issue because his right to a fair and impartial trial was violated.

The plain error rule is an exception to the waiver doctrine and permits the consideration of errors affecting substantial rights.  134 Ill. 2d R. 615(a); 
People v. McCormick
, 328 Ill. App. 3d 378, 381 (2002).  The purpose of the plain error rule is to afford certain protections to the accused by correcting serious injustices and to preserve the integrity and reputation of the judicial process.  
People v. Young
, 128 Ill. 2d 1, 46 (1989).  However, the plain error rule may only be invoked in criminal cases in two limited circumstances. 
People v. Williams
, 333 Ill. App. 3d 204, 209 (2002).  First, where the evidence is closely balanced, a reviewing court may consider a claimed error that was not properly preserved, so as to preclude argument that an innocent person may have been wrongly convicted. 
 
People v. Vargas
, 174 Ill. 2d 355, 363 (1996).  Second, a reviewing court may invoke the plain error rule to review waived errors that are of such magnitude that there is a substantial risk that the accused was denied a fair and impartial trial, and remedying the error is necessary to preserve the integrity of the judicial process.  See 
Vargas
, 174 Ill. 2d at 363.

In this case, defendant confessed that he used a .44-caliber handgun to fire a shot at the red Cavalier.  Steven Williams testified that the bullet passed through the car's trunk and struck the victim's elbow.  After being shot, the victim crashed the car into another parked car.  The victim and Steven then tried to escape on foot.  They were caught by the GD's.  The victim was then dragged to the side of a building and beaten by defendant's fellow gang members.  After the beating, one of defendant's fellow gang members shot and killed the victim.  After defendant's arrest, the police found the .44-caliber handgun in defendant's home.  In his written confession, defendant admitted that the handgun that the police found in his apartment was the same gun that he used to shoot at the red Cavalier. The evidence 
adduced at trial was overwhelmingly against defendant.  Thus, the first prong of the plain error rule is not applicable to this case.

 We next examine the second prong of the plain error rule to determine whether it should be invoked to review this case.

In this case, Judge Sacks covered the required subjects mandated in 
People v. Zehr
, 103 Ill. 2d 472 (1984), and Illinois Supreme Court Rule 431 (177 Ill. 2d R. 431).  At the commencement of 
voir
 
dire
, Judge Sacks addressed all prospective jurors as a group.  The judge asked the group whether they all understood and accepted that the defendant was presumed innocent of the charges against him, that the State had to prove the defendant guilty beyond a reasonable doubt, that the defendant was not required to offer any evidence on his own behalf and the defendant's failure to testify could not be held against him.  As the State points out, the trial court may ask these questions "individually or in a group," "[i]f requested by the defendant." 177 Ill. 2d R. 431 (b).  Here, the record does not reflect that the defendant requested that these questions be asked.  The defendant on appeal replies that his claim of error rests on the last sentence of Supreme Court Rule 431(b): "[t]he court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." 177 Ill. 2d R. 431 (b).

After asking the jurors as a group whether they accepted and understood the above principles, Judge Sacks questioned each venire member individually whether he or she could be fair and impartial.  All those venire persons who eventually were selected to serve on the jury answered affirmatively.  With the exception of two seated jurors, Elizabeth Hall and Sally Sellers, Judge Sacks asked every juror individually whether they had raised their hands in response to the earlier announced principles.  All jurors answered "no" to this question.

The record indicates that the defendant wanted Sally Sellers on the jury.  When the State used a peremptory challenge to strike Sellers, the defendant objected to the State's motion.  After hearing arguments from both sides, Judge Sacks overruled the State's challenge and Sellers was kept on the jury.  Further, defense counsel asked juror Hall twice whether she could be fair, and she offered no reason that she could not be fair at the trial.   Moreover, it is impossible for this court to review any potential questions that the prospective jurors might have had as they raised their hands in response to Judge Sacks's en masse questions, because the defendant did not identify the names of those prospective jurors for the record.  "It is well settled that an appellant bears the burden of
 preserving a sufficient record for review and any doubts arising from an incomplete record will be resolved against the appellant."
  
People v. Ranstrom
, 304 Ill. App. 2d 664, 672 (1999).  See also 
People v. Smith
, 106 Ill. 2d 327, 334-35 (1985).  This court has held that the defendant is required to object to any errors during jury selection.  
People v. Robinson
, 299 Ill. App. 3d 426, 436-37 (1998). "Otherwise, counsel, by not giving the court the opportunity to prevent or correct errors at trial, will gain the advantage of obtaining a reversal through  failure to act, either intentionally or inadvertently." 
Robinson
, 299 Ill. App. 3d at 437 (1998).  After a careful review of the record, any errors in conducting the 
voir
 
dire
 were not of such magnitude that there was a substantial risk that defendant was denied a fair and impartial trial.  Consequently, we will not invoke the plain error rule.  

SUBSTITUTION OF JUDGE

Defendant next asserts that he was deprived of a fair trial because Judge McSweeney-Moore asked Judge Sacks to preside over the 
voir
 
dire
 in this defendant's case while she 
voir
 
dired
 the co-defendant's venire.

As stated earlier, a defendant must object to alleged errors at trial and include the objection in a posttrial motion in order to preserve an issue for appellate review.  
Enoch
, 122 Ill. 2d at 186.  The record indicates that defendant did not object to Judge Sacks's presiding over the jury selection; nor did the defendant include this issue in his posttrial motion.  Thus, this issue is waived.

Even assuming 
arguendo
 that the defendant had preserved this issue for appeal, the fact that a different judge conducted the 
voir
 
dire
 did not 
per se
 deprive defendant of a fair trial.  "As a general rule, a judge cannot finish the performance of a duty already entered upon by his [or her] predecessor where that duty involves the exercise of judgment and the application of legal knowledge to, and judicial deliberation of, facts known only to the predecessor."  
People v. Groves
, 287 Ill. App. 3d 84, 97 (1997).  However, there is "no bright-line rule that substitution of a judge during any stage of a trial, including 
voir
 
dire
, is per se reversible error."  
Groves
, 287 Ill. App. 3d at 98
.  This is because "the examination of jurors under 
voir
 
dire
 does not elicit any information that can be used in the trial of the case.  Such examination is merely for the purpose of securing a competent, fair, and unprejudiced jury.  That function can be performed properly by any judge."  
Groves
, 287 Ill. App. 3d at 98.

On appeal, defendant argues that 
Groves
 was wrongly decided, urging us instead to follow 
Meredeth v. People
, 84 Ill. 479 (1877), 
Durden v. People
, 192 Ill. 493 (1901), 
People v. Vargas
, 174 Ill. 2d 355 (1996), and 
People ex rel. Rice v. Cunningham
, 61 Ill. 2d 353 (1975), which he argues support his position.

In 
Meredeth
, in a murder trial, the trial judge was absent from the courtroom for almost two days during arguments.  During the judge's absence, the trial was presided over by two members of the bar and order was not maintained in the courtroom.  
Meredeth
, 84 Ill at 482.  The supreme court reversed, holding that "the absence of the judge from the courtroom, engaged in other judicial labors, for a part of two days, in a trial of this magnitude, can not be justified on any principle or for any cause."  
Meredeth
, 84 Ill. at 482.

In 
Durden
, the trial judge who presided over the jury trial heard a portion of defense counsel's closing argument and then absented himself from the proceedings.  In addition, without notice to the parties, another judge who had no knowledge of the on-going case took his place on the bench and presided over the rest of the trial, ruled on objections during closing arguments and ruled upon the jury instructions.  The first judge did not return until the hearing on the motion for a new trial.  
Durden
, 192 Ill. at 494-97.  In reversing the ruling of the trial court, the Illinois Supreme Court held that circuit judges may hold court for each other and perform each other's duties where they find it necessary or convenient; however, the substitution of judges in a single trial is inappropriate unless knowledge of the case is wholly irrelevant to the performance of the judicial task.  
Durden
, 192 Ill. at 498-99. 

In 
Vargas
, the trial judge left the courtroom during a jury trial to take a phone call.  While the judge was absent, the defense counsel continued his cross-examination of a State witness.  The Illinois Supreme Court held that "total judicial absence for a portion of a felony trial [] is 
per se
 reversible because such error is inherently prejudicial, not only to defendant's right to a fair trial but also to the integrity of the judicial process."  
Vargas
, 174 Ill. 2d at 366.

In 
Cunningham
, the Illinois Supreme Court addressed the three- judge panel formerly required by statute in death penalty cases.  Consequently, 
Cunningham
's ruling does not apply to this case.  The facts in 
Meredeth
, 
Durden
, and 
Vargas
 make those cases wholly inapposite to the case 
sub
 
judice
.

In this case, Judge Sacks presided over the jury selection.  Judge Sacks informed the entire venire that he was selecting the jury for Judge McSweeney-Moore and she would preside over the trial.  After selecting and swearing in the jury, Judge Sacks  transferred the jury to Judge McSweeney-Moore.  Judge Sacks did not participate in any other aspect of this trial.  The record reflects that Judge McSweeney-Moore ruled on the pretrial motions, heard the opening statements and the witnesses' testimony, ruled on motions, instructed the jury on the law, heard the closing arguments, took the verdict, ruled on posttrial motions and imposed the sentence.  Judge McSweeney-Moore presided over the entire trial herself.  Further, Judge Sacks's involvement in the case did not require any knowledge of the case.

We find the well-reasoned holding in 
People v. Groves
, 287 Ill. App. 3d 84 (1997), to be controlling.  In fact, defendant presents a weaker case for reversal than did the defendant in 
Groves
.  There, the defendant objected to having a judge other than the trial judge conduct the 
voir
 
dire
.  Here, no objection was ever raised.  As the Illinois Supreme Court has stated, "a trial court abuses its discretion in the conduct of 
voir
 
dire
 only if a review of the record reveals that the trial court's conduct thwarted the selection of an impartial jury." 
People v. Metcalfe
, 202 Ill. 2d 544, 559 (2002). There is absolutely no evidence in this record supporting such a conclusion.  Accordingly, the substitution of a different judge for 
voir
 
dire
 did not violate defendant's right to a fair trial.

Of course, a better practice would be for the trial court to ask the parties on the record whether they agreed to using a different judge to preside over 
voir
 
dire
.  Employing this procedure would only take a few seconds and it would save the parties on appeal, as well as this court, many hours of effort currently spent on resolving what should be a simple question.

CLOSING ARGUMENT

On appeal, defendant asserts that he was denied a fair trial based upon the State's closing and rebuttal arguments where the prosecutor (1) improperly bolstered their witnesses' credibility; (2) used argument unsupported by evidence that defendant and his gang scared off witnesses; (3) inflamed the jury by saying that defendant was a high-ranking gang member; and (4) implored the jury to use this case to send a message to street gangs.

In reviewing these allegations of error, we first note that  defendant only objected to the prosecutor's comment that defendant was a high-ranking gang member.  This objection was sustained.  A prosecutor is allowed a great deal of latitude in making a closing argument.  
People v. Cisewski
, 118 Ill. 2d 163, 175 (1987).  The trial court's determination of the propriety of the argument will generally be followed absent a clear abuse of discretion.  
People v. Strong
, 274 Ill. App. 3d 130, 139 (1995).  To constitute reversible error, the complained-of remarks must have resulted in substantial prejudice to the accused, such that absent those remarks, the verdict would have been different.  
People v. Heard
, 187 Ill. 2d 36, 73 (1999).   

After reviewing the record in this case, we cannot say that had the complained-of statements not been made, the outcome of defendant's trial would have been different.  Defendant was convicted of first degree murder, and the evidence in support of the conviction was overwhelming.  The defendant confessed that he used his 44 Magnum handgun to fire a shot at the victim's car.  The bullet went through the trunk of the car and hit the victim's elbow, which caused the victim to lose control of the car and crash.  The victim and his brother then tried to flee.  The victim was chased, caught, dragged to the side of a building and beaten by the defendant's fellow gang members.  Finally, one of the gang members shot and killed the victim.  After arresting defendant, the police recovered the 44 Magnum handgun defendant said he used in defendant's home.  Based on this evidence, we find that the outcome of the case would not have been different even without the complained-of comments.  Furthermore, we find that any prejudice stemming from the allegedly improper argument was minimal because the jury was instructed that opening and closing arguments are not evidence.  See 
People v. Simmons
, 331 Ill. App. 3d 416, 421 (2002); 
People v. Reeves
, 228 Ill. App. 3d 788, 800 (1992).  Thus, defendant was not deprived of a fair trial.

EXCESSIVE SENTENCE

Finally, defendant asserts that the trial court erred in considering a void prior conviction in sentencing defendant.

A reviewing court will not disturb a sentence unless the trial court has abused its discretion.  
People v. Streit
, 142 Ill. 2d 13, 19 (1991); 
People v. Shields
, 298 Ill. App. 3d 943, 951 (1998).  A sentence within the statutory limits will not be overturned on appeal unless it is manifestly disproportionate to the nature of the offense.  
People v. Luckett
, 295 Ill. App. 3d 342, 349 (1998).  A sentence is presumptively correct, and only where such presumption has been rebutted by an affirmative showing of error will a reviewing court find that the trial court abused its discretion.  
People v. Luna
, 234 Ill. App. 3d 544, 550-51 (1992).

In Illinois, the sentence for a first degree murder conviction is 20 to 60 years' imprisonment.  See 730 ILCS 5/5-8-1 (West 1998).  Defendant's sentence of 45 years' imprisonment was within the legislative limitations.  In sentencing defendant, the trial court stated "the defendant [did] not have significant prior criminal history."  The trial court then noted that "[h]e was convicted by a jury of the first degree murder [of the victim]."  The court then sentenced defendant to 45 years in prison.  The record indicates that the weight that the trial court put upon the defendant's prior conviction was so insignificant that it did not lead to a greater sentence.  Further, in the sentencing hearing, the State did not use defendant's prior conviction as a factor in aggravation.  Based on the record, we find the trial court did not abuse its discretion in sentencing defendant.  As such, the judgment of the trial court is affirmed.

     Accordingly, the judgment of the trial court is affirmed.

     Affirmed.

CAMPBELL, P.J., and HARTIGAN, J., concur.