THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES FOLKS, Defendant-Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES E. GARDNER, Defendant-Appellant.

Fourth District   Nos. 4—93—1045, 4—93—1046 cons.

Opinion filed June 21, 1995.

Daniel D. Yuhas and John M. McCarthy, both of State Appellate Defender's Office, of Springfield, for appellant James Folks.

Charles M. Schiedel and Allen H. Andrews, both of State Appellate Defender's Office, of Springfield, for appellant Charles E. Gardner.

Lawrence R. Fichter, State's Attorney, of Decatur (Norbert J. Goetten, Robert J. Biderman, and Denise M. Ambrose, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GREEN delivered the opinion of the court:

On May 18, 1993, an information was filed in the circuit court of Macon County charging defendant Charles E. Gardner with several offenses alleged to have occurred on May 17, 1993. On May 19, 1993, additional charges were filed in that case naming James Folks (James) as an additional defendant and setting forth other offenses alleged to have been committed by one or both of those defendants on May 17, 1993. Further informations were later filed against both defendants.

After a joint bench trial, the court entered judgments on October 19, 1993, finding Gardner guilty of three counts of attempt (first degree murder) (720 ILCS 5/8—4(a), (c)(1) (West 1992)) and one count of aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(4) (West 1992)) and finding James guilty of two counts of attempt (first degree murder) and two counts of aggravated discharge of a firearm. Subsequently, the court sentenced Gardner to three concurrent 30-year terms of imprisonment for attempt and a concurrent 15-year term of imprisonment for the aggravated unlawful discharge offense. All terms were ordered to be consecutive to a 15-year term of imprisonment Gardner was then serving. The court sentenced James to two concurrent 30-year terms of imprisonment for attempt and two concurrent 15-year terms of imprisonment for the aggravated unlawful discharge offenses.

Each defendant appealed separately—James in case No. 4—93—1045, and Gardner in case No. 4—93—1046—and we have consolidated those appeals. The State's proof of the offenses of which James was convicted was based on a theory that he was accountable for offenses committed by Gardner. James asserts the proof that he committed attempt (first degree murder) was insufficient because the State failed to prove beyond a reasonable doubt that he shared an intent with Gardner that the intended victims of Gardner die. Both defendants contend they were denied effective assistance of counsel and that the statutory provisions creating the offense of aggravated unlawful discharge of a firearm are unconstitutional. Gardner also contends that the circuit court erred in receiving evidence that his nickname was "Al Capone." We affirm.

The evidence was undisputed that on the evening of May 17, 1993, Gardner, James, James' brother Paul Folks (Paul), and Howard Bailey were in a burgundy-colored Celebrity automobile which was driven by James and which went by the home of Kenny and Thomas Beasley on North Edwards Street in Decatur several times. During that time, Gardner fired several shots with a pistol.

Sheila Marie Dailey testified for the State explaining that (1) she

lived in the house with the Beasleys; (2) on May 17, 1993, at about 6:30 p.m., she had driven a car into the driveway at that house and the Beasleys were working in the garage; (3) at that time, Thomas Beasley approached her car when a car came up Edwards Street at a high rate of speed and screeched its brakes; (4) the car was very similar to one owned by James' sister; (5) she ducked down and heard sounds like fireworks coming from the car that had screeched its brakes; (6) she next heard a door slam and the foregoing car drive away; (7) she then went inside and called the police whereupon she heard shots from the rear of the house; (8) she then heard more shots from in front of the house; and (9) the police then came by and she did not see anything more of significance.

Santia Jelks testified that (1) at about 6:30 p.m. on May 17, 1993, she was driving in the 1100 block of North Edwards Street; (2) she saw a car heading south at that time which fit the description of the car James was driving; (3) she saw a man hanging out of the passenger window of that car shooting three or four shots at men on a car in the driveway of a house fitting the description of the Beasley house; (4) the gun was pointed at the men on the car; (5) the men on the car ran to the back of the house; (6) after the shots, the car from which they came drove off to the south; and (7) the man firing the shots was the same person as defendant Gardner to whom she pointed.

Jelks further explained that (1) after the car with Gardner in it left, she went to a nearby corner and called 911 telling what she had seen; (2) when she went back onto Edwards Street, she saw the same car come back in a northerly direction; (3) when it got by the Beasley house, Gardner got out and started chasing two boys at whom he was also shooting; (4) Gardner then got back in the car and it drove off toward Leafland Street; and (5) when that car reached Leafland Street, it turned west and she heard further shooting at that time.

Mike Wetzel testified that (1) he lived in the 1200 block of North Edwards Street, which was just north of its intersection with Leafland Street; (2) in the evening of May 17, 1993, he heard gunfire to the south and ran to the corner of Leafland and Edwards; (3) he saw a man crossing the street running east in the 1100 block of Edwards into the area between houses; (4) he saw a "maroon" car there; (5) he lost sight of that car but it returned coming west on Leafland and then going south on Edwards; (6) when the vehicle got to the middle of the block, shots were fired from the passenger side of the vehicle into a house; (7) the maroon vehicle left and returned again with a person getting out and doing some shooting and getting back in again; and (8) the car left but returned again and shots were fired from the car.

According to Wetzel (1) the car later came back, and by the middle of the 1100 block four or five more shots were fired at the house; (2) the car continued north to Leafland, where it turned east; (3) he was then inside the yard of a corner house; (4) three or four more shots were fired then and the gun was pointed directly at him; and (5) a gunshot had apparently broken the window of his house.

Howard Bailey testified for the State that (1) on May 17, 1993, he was at Paul's house when James appeared; (2) James' face was scarred and James had indicated this had resulted from a former fight with the Beasley brothers; (3) he, James, and Paul went for a ride in a burgundy-colored Celebrity automobile; (4) at some point James left the vehicle and he and Paul met Gardner; (5) later James returned to the car and began driving; (6) at no time did anyone say they were going to the Beasleys to get even with them and nobody knew Gardner had a gun with him; and (7) when they got to 1143 North Edwards Street, Gardner fired at the house.

According to Bailey (1) they then drove through an alley and came back by the Beasley house; (2) Gardner then fired three or four more times at one of the Beasleys as he was crossing the street; and (3) as they drove further, Gardner leaned out of the window and fired at a group of people on a corner. On cross-examination, Bailey stated that except in regard to the first shooting, he never saw Gardner aim at anyone and he could not remember any conversation during the evening's events concerning the gun Gardner used or as to how James was to drive the car.

Two Decatur police officers gave testimony, significant in regard to this appeal, when testifying for the State. Officer Lorne Sturdivant testified that he saw several shots fired from the burgundy-colored car at the corner of Edwards and Leafland Streets and began to chase that car at that time. Sturdivant testified that during the chase, while he was only $1\frac{1}{2}$ car lengths behind the car being chased, someone from that vehicle shot at him three or four times. Officer William Conley testified he was in a squad car that eventually joined the chase of the Celebrity and stated that the Sturdivant vehicle was well marked as a police car and had its emergency lights on during the chase. He also stated that when the chase ended, Gardner left the vehicle with a gun in his hand.

James testified on his own behalf. The thrust of his testimony was that no discussion of seeking revenge from or attacking the Beasleys occurred before they arrived at the Beasley house and James had no knowledge that Gardner was armed or intended to shoot at the Beasleys. James contended that when Gardner first started shooting, he drove into the driveway to turn around but Gardner

demanded that he keep going so he started to drive away from the house. According to James, he then saw a police car coming down the street so he turned around and drove back by the Beasley house, and as the police car approached, Gardner pointed a gun at him and required him to drive away seeking to elude the police.

We hold that proof of James' guilt of attempt (first degree murder) of Kenny and Thomas Beasley was sufficient. Although the evidence is not entirely clear as to how many times James drove by the Beasleys' house and shots were fired at them, clearly this happened several times. The court could have concluded beyond a reasonable doubt that on at least one occasion, Gardner got out of the car to chase and shoot at them. Even if James was surprised the first time Gardner shot, the evidence fully supports a determination that thereafter he cooperated with the intent of aiding Gardner in shooting at the Beasleys and eventually at Sturdivant and Wetzel.

The State seeks to uphold the conviction of James on the basis of the common purpose doctrine set forth in *People v. Terry* (1984), 99 Ill. 2d 508, 514-15, 460 N.E.2d 746, 749-50, whereby intent to commit the specific offense charged is not required. However, all the cases cited in that regard concern first degree murder cases. Although the offenses alleged as attempted here were first degree murder, the offense involved is, nevertheless, the inchoate offense of attempt. We need not pass upon whether an attempt offense can be proved under that theory. See *People v. Lopez* (1995), 166 Ill. 2d 441, 448.

■ "A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense." (720 ILCS 5/8—4(a) (West 1992).) A person is criminally responsible for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, or agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1992).

■ Prior to the enactment of section 9—1(a)(2) of the Criminal Code of 1961 (Code), whereby the killing of another without justification became murder if the actor "knows that such acts create a strong probability of death or great bodily harm" (Ill. Rev. Stat. 1961, ch. 38, par. 9—1(a)(2)), such knowledge upon the part of the actor constituted conduct from which the trier of fact could infer malice or the intent to kill. *People v. Lavac* (1934), 357 Ill. 554, 558, 192 N.E. 568, 569-70; *People v. Crenshaw* (1921), 298 Ill. 412, 416-17, 131 N.E. 576, 577-78.

The enactment of section 9—1(a)(2) of the Code made unnecessary the use of the inference of malice or intent to kill arising from

the dangerousness of acts knowingly and intentionally performed as far as proof of the commission of what is now first degree murder is concerned. However, the inference is still significant in regard to the proof of intent to kill in regard to the inchoate offense of attempt. (See *Lopez*, 166 Ill. 2d at 448.) Notably, no contention is made here that proof of Gardner's guilt of attempt (first degree murder) was insufficient because his intent to kill was not shown. By the same reasoning, James' intent to have the Beasleys, Sturdivant, or Wetzel killed is shown by the strong likelihood that shooting at them would result in their deaths.

■ On review, we uphold the sufficiency of the proof to convict in a criminal case if a reasonable trier of fact could conclude beyond a reasonable doubt that each element of the offense has been proved. (*Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2788-89; *People v. Campbell* (1992), 146 Ill. 2d 363, 374, 586 N.E.2d 1261, 1266.) Such was the proof of James' guilt of two counts of attempt (first degree murder).

■ James' claim of incompetence of counsel arises from the failure of his trial counsel to impeach Bailey's statement that nobody told James how or where to drive with a statement in a police report of Officer Fonville, which was on file and which stated as follows:

> "Howard went on to state that James was going to pull up in the driveway but Charles had told James to keep on going *** Howard went on to state that at the beginning, the police officer did not have any lights or sirens on, then all of a sudden, *the sirens on the police car had come on and that's when James was about to pull over and stop, but Charles had told him to keep on going and that's when James turned at the corner at an unknown street and Charles began shooting at police.*" (Emphasis added.)

James maintains that this impeachment would have given more strength to his contention that he continued driving during the chase only because of threats by Gardner.

The impeachment would thus bear upon the accountability of James for the firing at Sturdivant and Wetzel. James points out that if a defendant raises an issue of compulsion, the State then generally has the burden of proving lack of compulsion beyond a reasonable doubt. (*People v. Pegram* (1988), 124 Ill. 2d 166, 172-73, 529 N.E.2d 506, 509.) However, the compulsion defense was not available to James here in regard to the aggravated discharge of a firearm offenses against Sturdivant and Wetzel when he had ample opportunity to withdraw from the endeavor earlier when Gardner was out of the automobile. (*People v. Scherzer* (1989), 179 Ill. App. 3d 624, 645-46, 534 N.E.2d 1043, 1058; *People v. Colone* (1978), 56 Ill. App. 3d 1018,

1021, 372 N.E.2d 871, 873.) James was not deprived of effective assistance of counsel.

■ Gardner's claim of lack of effective assistance of counsel arises from the failure of his counsel to move to suppress Jelks' identification of him as the person she saw hanging out of the passenger side window of a car shooting at men sitting on a car. Testimony in the case by police officer Kent Pope indicated that shortly after Gardner's arrest, Pope told Jelks to drive by a squad car where Gardner was being held to see if that person was the one she had seen shooting from the car window. Jelks did that and later testified to Gardner being that shooter.

Under the seminal decision in *Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064, the second prong of the showing that a defendant in a criminal case must make in order to obtain relief for lack of effective counsel is that but for that counsel's incompetence, a reasonable probability exists that an acquittal would be obtained. We need not decide whether the desired motion to suppress should have been made as we are quite certain that lack of identification by Jelks would have made no difference in the outcome of the case. The evidence was strong and undisputed that Gardner was the only person in the burgundy-colored Celebrity automobile who fired a shot that night and that he fired many shots.

■ We make short work of Gardner's claim that introduction of evidence that his nickname was "Al Capone" created error. The case was heard at bench. The presumption exists that the court has considered only competent evidence absent a showing to the contrary. (*People v. Tye* (1990), 141 Ill. 2d 1, 26, 565 N.E.2d 931, 943.) Nothing of record indicates that the court gave any substantial consideration to that evidence. No error resulted.

■ Defendants' final contention is more complicated. The offense of aggravated discharge of a firearm set forth in section 24—1.2(a) of the Code creates an offense when a person "knowingly or intentionally" discharges a firearm under various described circumstances. (720 ILCS 5/24—1.2(a) (West 1992).) None of the described circumstances giving rise to the liability state that the firing must be accompanied by a culpable mental state. In arguing that the lack of a culpable mental state makes the statutory provision invalid, defendants cite *People v. Wick* (1985), 107 Ill. 2d 62, 481 N.E.2d 676.

In *Wick*, a defendant was convicted of aggravated arson under section 20—1.1(a) of the Code, which provided:

> "A person commits aggravated arson when by means of fire or explosive he knowingly damages, partially or totally, any building

or structure, including any adjacent building or structure, and ***
(3) a fireman or policeman who is present at the scene acting in
the line of duty, is injured as a result of the fire or explosion." (Ill.
Rev. Stat. 1981, ch. 38, par. 20—1.1(a).)

While section 20—1.1(a) did not require a wrongful mental state as
an element of the offense, sections 20—1(a) and (b) of the Code
respectively required mental states of acting without an owners
consent or "intent to defraud an insurer" in "knowingly" damaging
property by fire or explosive in order to commit the offense of simple
arson. Ill. Rev. Stat. 1981, ch. 38, pars. 20—1(a), (b).

The supreme court concluded that although the provision of sec-
tion 20—1.1(a)(3) of the Code was enacted to subject an arsonist to a
more severe penalty when firemen were injured, it violated due pro-
cess because it punishes "innocent as well as culpable" persons who
happened to start fires. (*Wick*, 107 Ill. 2d at 66, 481 N.E.2d at 835-36.)
While the *Wick* court discussed the anomaly of the more severe
penalty arising from the aggravated offense which required a less
culpable mental state (*Wick*, 107 Ill. 2d at 64-65, 481 N.E.2d at 678),
the basis of the invalidity of the statute was its inclusion of innocent
people who start fires.

Under section 24—1.2(a) of the Code, every one of the circum-
stances covered involves the firing of a firearm under circumstances
which are extremely dangerous. That, of itself, is enough to justify
section 24—1.2(a) of the Code. We note that the validity of section
24—1.2(a) was upheld by the First District Appellate Court in *People
v. James* (1993), 246 Ill. App. 3d 939, 617 N.E.2d 115. There, the court
negated the argument made by defendants here that section 24—
1.2(a) is invalid because it is an included offense of aggravated as-
sault when, in committing an assault, he discharges a firearm, plac-
ing another in reasonable apprehension of receiving a battery (720
ILCS 5/12—2(a)(3) (West 1992)). As we conclude that the *Wick* court
did not render its decision upon the basis of a more severe penalty
being imposed for an included offense, we need not discuss the issue
further.

We do not find section 24—1.1(a) of the Code deprives defendants
of due process or is otherwise invalid.

For the reasons stated, we affirm the convictions and sentences
imposed by the circuit court.

No. 4—93—1045, Affirmed.
No. 4—93—1046, Affirmed.

LUND and McCULLOUGH, JJ., concur.