815 N.E.2d 809 (2004)
352 Ill. App.3d 180
287 Ill.Dec. 165
The PEOPLE of the State of Illinois, Plaintiff-Appellee,
v.
George KASP, Defendant-Appellant.
No. 1-03-3227.
Appellate Court of Illinois, First District, Sixth Division.
August 20, 2004.
*811 David P. Wiener, James N. Perlman, Chicago, for Appellant.
Office of the Illinois State's Attorney, Richard A. Devine, State's Attorney, Renee Goldfarb, James E. Fitzgerald, and William L. Toffenetti, Assistant State's Attorneys, Chicago, for Appellee.
*812 Justice FITZGERALD SMITH delivered the opinion of the court:
Following a jury trial, defendant George Kasp (defendant) was convicted of aggravated discharge of a firearm and sentenced to seven years in prison. He appeals, contending that the crime of aggravated discharge of a firearm violates the proportionate penalties clause of our state constitution and that it unconstitutionally proscribes lawful activity. Based on these allegations, defendant seeks the outright reversal of his conviction. Alternatively, he contends that his conviction must be reversed and remanded because reversible error occurred during his trial when the jury was not given an instruction on self-defense. For the following reasons, we affirm.

BACKGROUND
Defendant and codefendants Carlos Lopez and Erick Brito were charged with two counts of attempted first degree murder and two counts of aggravated discharge of a firearm. Lopez and Brito pled guilty to aggravated discharge of a firearm and the attempted first degree murder charges were dropped. Defendant stood trial on all charges before a jury, from which the following evidence was adduced.
Luis Ruiz testified that at 11:30 p.m. on June 23, 2002, he was driving alone in his dark green Jeep in a Chicago neighborhood when another car, a dark blue Jeep driven by defendant, sideswiped him. Ruiz, who had a gun in his car, stopped to allow defendant to pull alongside him to discuss the incident. When defendant did so, his front-seat passenger, Lopez, pulled out a gun and aimed it at Ruiz. Ruiz passed defendant and drove off, making several turns through the neighborhood streets in an effort to avoid him. Defendant followed Ruiz and continued to do so for several blocks, and then began to ram Ruiz's car from behind. After this occurred multiple times, Ruiz heard gunshots coming from defendant's car and he saw Lopez's arm hanging out of defendant's passenger window holding a gun and aiming it at his car. Ruiz, who was traveling at approximately 40 miles per hour, eventually lost control and hit a parked car. Defendant stopped his car nearby. Ruiz immediately jumped out of his car and started running down an alley. As he ran, he heard some 13 shots fired at him coming from the direction of defendant's car and hitting the garages lining the alley. Ruiz was able to run through the alley and later reach his home without being hurt. In addition to damage sustained when Ruiz hit the parked car, Ruiz's car had bullet holes in its frame, two flat tires, and ram marks on its side and rear bumper, and the back windshield had been shot out.
Officer Anthony Glaviano testified that he and his partner, who were patrolling the area in their police vehicle, received a report of shots fired. Immediately thereafter, they saw two Jeeps drive by them going in the opposite direction. Officer Glaviano stated that the dark green Jeep driven by Ruiz was in front and the dark blue Jeep driven by defendant was behind, ramming it. Officer Glaviano made a U-turn and followed the cars as they turned down several blocks in the neighborhood; at all times, defendant remained behind Ruiz. Officer Glaviano noticed that defendant had several passengers in his car. While they were driving, Officer Glaviano saw Lopez with his whole body hanging out of the passenger side of defendant's car and firing a gun at Ruiz. Ruiz then lost control of his car, hit a parked car and started to run. Officer Glaviano stated that, at this point, both Lopez and Brito exited defendant's car and began shooting *813 at Ruiz. Lopez then got back into defendant's car and defendant drove off.
Officer Alfredo Roman testified that he and his partner also responded to the report and pursued defendant after he drove away from the scene of the accident. Officer Roman saw defendant slow down and then drive around a police barricade, whereupon Lopez threw a gun out of the passenger window onto the street. Officer Roman continued to pursue defendant, who drove head-on into a police car, injuring another officer. Defendant then exited his car and began to run. Officer Roman pursued him on foot and arrested him.
Officer Hutcheson testified that she and her partner were in the vicinity and heard shots fired. They proceeded to an alley and saw Brito standing on the street firing a gun. Officer Hutcheson then assisted other officers in pursuing defendant's car. Once defendant was apprehended, she inspected defendant's car. In addition to damage on the front of the car due to the head-on collision with the police car, she found shell casings inside, bullet holes in the back frame of the car, the rear window shot out and various scrapings. She also found damage to the back bumper.
Defendant testified on his own behalf. He stated that he was driving his Jeep with his friends Lopez, Brito, Maya Diaz DeLeon and Andres Rivera inside; Lopez was in the front passenger seat, Brito and DeLeon were in the backseat and Rivera sat in the cargo area. Defendant testified that he was making a wide turn when he accidentally sideswiped Ruiz's car. He was about to get out to speak to Ruiz when 15 to 20 men surrounded his car, screaming and hitting his windows. Defendant drove away and Ruiz began to follow him. Defendant averred that when Ruiz caught up to him, Ruiz started ramming his car into defendant's from behind. Lopez turned around in his seat and shot at Ruiz, but Ruiz continued to ram them. Defendant testified that Ruiz rammed them so hard that he pushed defendant into a median and Ruiz careened into a fire hydrant and a parked car. Lopez and Brito jumped out of defendant's car, chasing and shooting at Ruiz as defendant attempted to get his car off the median. While defendant was trying to drive away, Lopez returned and jumped into his moving car. Defendant slowed down when he approached a police roadblock; he testified that Lopez told him to go around it because he still had his gun. Defendant drove around the roadblock, continued driving and eventually hit a police car head-on. He then got out of his car and attempted to run because he was scared and did not want to be arrested. Defendant further testified that he did not have a gun on him or in his car, that he did not know that Lopez had a gun, that he did not tell Lopez or Brito to shoot at Ruiz, and that the bullet holes in the frame of the rear of his car came from Lopez, who had turned around to shoot at Ruiz during the chase.
Rivera and Diaz DeLeon also testified on defendant's behalf. Rivera testified that he was sitting in the cargo area of defendant's car when defendant made a wide turn and sideswiped Ruiz's car. Defendant stopped, but 15 to 20 men approached his car, so defendant drove away. Rivera stated that Ruiz followed defendant and rammed him several times from behind. Rivera then heard gunshots. He testified that he never saw an arm coming out of Ruiz's car shooting at them, but he did see muzzled flashes coming from both the front of defendant's car and Ruiz's car; Rivera was shot in the foot. Ruiz lost control of his car and crashed. Rivera averred that Lopez and Brito got out of defendant's car, that Lopez began to shoot at Ruiz, and that when Lopez returned to *814 the car, they left the scene. Rivera stated that officers started chasing defendant, who got into an accident. On cross-examination, Rivera testified that he never saw Ruiz or Lopez shoot a gun; he simply heard shots. Rivera also stated that he did not believe defendant's back window was shot out and that he did not see any guns in defendant's car. Diaz DeLeon testified that she was in defendant's car when he sideswiped Ruiz. She stated that when defendant stopped, a group of men approached the car and defendant quickly drove away. She further stated that Ruiz began to follow and ram them. She heard shots and ducked down in the back seat. She did not see what happened thereafter but testified that Ruiz was always behind defendant during the chase.
During closing argument, the State asserted that under the accountability theory, defendant must be held accountable for the actions of Lopez and Brito in shooting at Ruiz. Defense counsel disputed this, arguing that there was no plan among defendant, Lopez and Brito to shoot at Ruiz, but that this was simply a spontaneous act committed solely by Lopez and Brito and defendant was merely driving his car at the time it occurred. The jury acquitted defendant of attempted first degree murder but found him guilty on the aggravated discharge of a firearm counts. The trial court sentenced him to seven years in prison.

ANALYSIS
Defendant makes three contentions on appeal. We address each separately.

I. Disproportionate Penalties
Defendant's first contention on appeal is that the crime of aggravated discharge of a firearm, of which he was convicted, violates the proportionate penalties clause of our state constitution vis-a-vis the crime of reckless discharge of a firearm because the latter requires proof beyond a reasonable doubt that a defendant's conduct endangers the victim's bodily safety whereas the former has no requirement of any endangerment to the victim. Defendant insists that under the cross-comparison proportionality review test, the two crimes share a common statutory purpose, yet, due to reckless discharge's "added element" of actual endangerment, aggravated discharge is inherently a less serious offense but incorrectly bears a heavier sentence. Because of this, defendant insists, his conviction must be reversed outright. We disagree.
A statute is presumed to be constitutional, and, thus, the party challenging it bears the burden of clearly demonstrating its invalidity. See People v. Zapata, 347 Ill.App.3d 956, 966, 283 Ill.Dec. 776, 808 N.E.2d 1064 (2004); accord People v. Garza, 298 Ill.App.3d 452, 461, 232 Ill.Dec. 734, 699 N.E.2d 181 (1998). It is well-settled that the legislature has wide discretion to set penalties for the offenses it defines and such penalties will not be invalidated unless they clearly exceed the very broad constitutional limitations that apply. See Garza, 298 Ill.App.3d at 461, 232 Ill.Dec. 734, 699 N.E.2d 181; see also People v. Townsend, 275 Ill.App.3d 413, 418, 211 Ill.Dec. 286, 654 N.E.2d 1096 (1995). Because the legislature is better able to gauge the seriousness of the different offenses it defines, we, as a reviewing court, will not interfere with its judgment with respect to the penalties it institutes "unless the punishment is cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community." Garza, 298 Ill.App.3d at 461, 232 Ill.Dec. 734, 699 N.E.2d 181. Rather, we are duty-bound to construe a statute in a manner that upholds its validity and constitutionality if this can reasonably be done. See Zapata, 347 Ill.App.3d *815 at 966-67, 283 Ill.Dec. 776, 808 N.E.2d 1064; People v. Cosby, 305 Ill.App.3d 211, 224, 238 Ill.Dec. 513, 711 N.E.2d 1174 (1999) (we must affirm statute's constitutionality and validity whenever possible). This is especially true when the statute's language is certain and unambiguous, thereby indicating the legislature's intent, which must be given effect. See Cosby, 305 Ill.App.3d at 224, 238 Ill.Dec. 513, 711 N.E.2d 1174 ("language of a statute is the best indication of the legislature's intent"); People v. James, 246 Ill.App.3d 939, 948, 186 Ill.Dec. 876, 617 N.E.2d 115 (1993). Where, as here, we are called upon to examine the constitutionality of a statute, we employ a de novo standard of review. See Zapata, 347 Ill.App.3d at 967, 283 Ill.Dec. 776, 808 N.E.2d 1064.
As defendant correctly notes, one of the limitations imposed upon our legislature's otherwise broad power to determine penalties for offenses is the constitutional guarantee of proportionate sentences. See Townsend, 275 Ill.App.3d at 418, 211 Ill.Dec. 286, 654 N.E.2d 1096. That is, the proportionate penalties clause of the Illinois Constitution provides "`[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship.'" People v. Washington, 343 Ill.App.3d 889, 896, 279 Ill.Dec. 368, 800 N.E.2d 436 (2003), quoting Ill. Const. 1970, art. I, § 11; see also Zapata, 347 Ill.App.3d at 967, 283 Ill.Dec. 776, 808 N.E.2d 1064; People v. Austin, 349 Ill.App.3d 766, 772, 285 Ill.Dec. 768, 812 N.E.2d 588 (2004). This requires the legislature, in defining crimes and their penalties, to consider the constitutional goal of instituting penalties according to the seriousness of the offense. See People v. Powell, 299 Ill.App.3d 92, 96, 233 Ill.Dec. 425, 701 N.E.2d 68 (1998). In this sense, we on appeal must examine the sentencing scheme at issue and determine whether it provides a proportionate penalty for the offense at issue. See Powell, 299 Ill.App.3d at 96-97, 233 Ill.Dec. 425, 701 N.E.2d 68.
Defendant's proportionality challenge focuses on two specific statutes of the Illinois Criminal Code of 1961: aggravated discharge of a firearm (of which he was convicted) and reckless discharge of a firearm. 720 ILCS 5/24-1.2, 24-1.5 (West 2002). The aggravated discharge of a firearm statute states:
"(a) A person commits aggravated discharge of a firearm when he or she knowingly or intentionally:
(1) Discharges a firearm at or into a building he or she knows or reasonably should know to be occupied and the firearm is discharged from a place or position outside that building;
(2) Discharges a firearm in the direction of another person or in the direction of a vehicle he or she knows or reasonably should know to be occupied by a person;
* * *
(b) A violation of subsection (a)(1) or subsection (a)(2) of this Section is a Class 1 felony." 720 ILCS 5/24-1.2 (West 2002).
Meanwhile, the reckless discharge of a firearm statute states:
"(a) A person commits reckless discharge of a firearm by discharging a firearm in a reckless manner which endangers the bodily safety of an individual.
(b) If the conduct described in subsection (a) is committed by a passenger of a moving motor vehicle with the knowledge and consent of the driver of the motor vehicle the driver is accountable for such conduct.

*816 (c) Reckless discharge of a firearm is a Class 4 felony." 720 ILCS 5/24-1.5 (West 2002).
A violation of the proportionate penalties clause may occur in three separate instances: where the punishment for an offense is cruel, degrading or wholly disproportionate to the offense; where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more harshly; or where identical offenses are given different sentences. See Zapata, 347 Ill.App.3d at 968, 283 Ill.Dec. 776, 808 N.E.2d 1064; Washington, 343 Ill.App.3d at 896, 279 Ill.Dec. 368, 800 N.E.2d 436. Defendant's claims fall under the second test, i.e., that aggravated discharge and reckless discharge are similar offenses and that aggravated discharge creates a less serious threat to the public than does reckless discharge but is punished more harshly.
This second, or cross-comparison, test involves two steps. See Austin, 349 Ill.App.3d at 772-73, 285 Ill.Dec. 768, 812 N.E.2d 588; Zapata, 347 Ill.App.3d at 969, 283 Ill.Dec. 776, 808 N.E.2d 1064; Washington, 343 Ill.App.3d at 896, 279 Ill.Dec. 368, 800 N.E.2d 436. First, we must consider whether the compared statutes share a common statutory purpose such that the cross-comparison test is appropriate; second, if the purposes are similar, then we consider whether the offense with the harsher penalty is more serious than the offense with the lesser penalty. See Austin, 349 Ill.App.3d at 772-73, 285 Ill.Dec. 768, 812 N.E.2d 588; Zapata, 347 Ill.App.3d at 969, 283 Ill.Dec. 776, 808 N.E.2d 1064; Washington, 343 Ill.App.3d at 896, 279 Ill.Dec. 368, 800 N.E.2d 436. With respect to the first step, the cross-comparison test is inappropriate and cannot be applied when the statutory purposes are different and distinct. See Austin, 349 Ill.App.3d at 772-73, 285 Ill.Dec. 768, 812 N.E.2d 588; see also Zapata, 347 Ill.App.3d at 969, 283 Ill.Dec. 776, 808 N.E.2d 1064 (it is inappropriate to compare offenses and their penalties unless they have common statutory purposes). This is because when offenses have different purposes, we must presume that the legislature considered different factors in establishing the penalties for them and defer to its judgment. See Austin, 349 Ill.App.3d at 772-73, 285 Ill.Dec. 768, 812 N.E.2d 588; see also Cosby, 305 Ill.App.3d at 226, 238 Ill.Dec. 513, 711 N.E.2d 1174 (legislature is more aware of evils confronting society and thus is more capable of measuring seriousness of particular offenses than is reviewing court); Townsend, 275 Ill.App.3d at 419, 211 Ill.Dec. 286, 654 N.E.2d 1096 (when offenses are distinct, legislature is "fully within its power to punish these offenses differently"). With respect to the second step, the proportionate penalties clause is violated only if the penalty prescribed for the less serious offense is greater than the penalty prescribed for the more serious offense. See Washington, 343 Ill.App.3d at 896, 279 Ill.Dec. 368, 800 N.E.2d 436. It is our view that the cross-comparison test is inappropriate in the instant case and, even were we to apply it, defendant cannot meet its requirements to prove a proportionate penalties violation indeed occurred here.
Beginning with the first step of the cross-comparison test, we note that neither statute at issue states its purpose within the statute itself; therefore, we look to their histories and language for guidance in determining their purposes and evaluating whether they are similar or different. See Washington, 343 Ill.App.3d at 897, 279 Ill.Dec. 368, 800 N.E.2d 436; People v. Carmichael, 343 Ill.App.3d 855, 864, 278 Ill.Dec. 683, 799 N.E.2d 401 (2003) (where legislature does not state purpose *817 in statute itself, we look to its plain language as best indication of legislature's intent in enacting it). Contrary to defendant's generalization that the two statutes are similar because they both criminalize the discharge of a firearm, we find that they in fact possess very different and distinct statutory purposes. To prove the offense of aggravated discharge, an essential element is the offender's awareness of the presence of an individual in the direction in which he fires a weapon (see People v. Ruiz, 342 Ill.App.3d 750, 758, 277 Ill.Dec. 244, 795 N.E.2d 912 (2003)); that is, this crime makes it unlawful to intentionally fire a weapon knowing that weapon is being fired at or in the direction of someone else (see James, 246 Ill.App.3d at 944-45, 186 Ill.Dec. 876, 617 N.E.2d 115). The focus of this offense, then, is clearly the intentional firing of a weapon knowingly and directly at someone.
In contrast, the reckless discharge statute focuses primarily on the prevention of "`reckless, not knowing or intentional, discharge of a firearm.'" Austin, 349 Ill.App.3d at 773, 285 Ill.Dec. 768, 812 N.E.2d 588, quoting Washington, 343 Ill.App.3d at 898, 279 Ill.Dec. 368, 800 N.E.2d 436. Our courts have on more than one occasion clarified that the particular, underlying purpose of this particular statute is to target the issue of drive-by shootings. See Washington, 343 Ill.App.3d at 897, 279 Ill.Dec. 368, 800 N.E.2d 436; Carmichael, 343 Ill.App.3d at 864, 278 Ill.Dec. 683, 799 N.E.2d 401. As legislative transcripts and prior case law reveal, the formation of this offense was to fill a void that existed in the law, in response to the question: "`[W]hat if somebody just recklessly discharges a firearm? Doesn't necessarily aim it at someone of [sic] aim it into a [sic] occupied building, but goes around town or out in the country or wherever it is shooting off a gun recklessly, with reckless abandon?'" Washington, 343 Ill.App.3d at 897, 279 Ill.Dec. 368, 800 N.E.2d 436, quoting 88th Ill. Gen. Assem., House Proceedings, April 22, 1993 at 210 (statements of Representative Homer). Thus, the reckless discharge statute "was intended to clarify a `loophole' then existing in Illinois law, where an individual could escape felony charges for his involvement in a drive-by shooting simply because he was acting recklessly, rather than knowingly." Washington, 343 Ill.App.3d at 898, 279 Ill.Dec. 368, 800 N.E.2d 436; accord Carmichael, 343 Ill.App.3d at 864, 278 Ill.Dec. 683, 799 N.E.2d 401, quoting 88th Ill. Gen. Assem., House Proceedings, April 22, 1993, at 210 (statements of Representative Homer) ("the purpose of [the reckless discharge] statute was to `fill[ ] in a void' in Illinois law which previously allowed a person who discharged a firearm recklessly to avoid felony charges"). Clearly, to be convicted of this crime, it is not essential that the offender intentionally or knowingly shoot at or in the direction of someone, but simply that he discharge a weapon in such a way as to place a person in danger; unlike aggravated discharge, it is not necessary that the weapon be discharged in the direction of a person for the crime of reckless discharge to be committed. See 720 ILCS 5/24-1.5 (West 2002).
The very elements of the two statutes differ, thus indicating that they are separate and distinct offenses and the legislature is fully within its power to punish them differently. Moreover, while, as defendant points out, both statutes may be the result of our legislature's acknowledgment of the dangers associated with the discharge of firearms, this generality does not overcome the fact that aggravated discharge and reckless discharge have distinctly different legislative purposes: aggravated discharge, to prevent persons from intentionally shooting directly at someone; reckless discharge, to prevent *818 the reckless (not knowing or intentional) discharge of a firearm not directed at a specific someone but nonetheless endangering members of the public at large. See, e.g., Washington, 343 Ill.App.3d at 898, 279 Ill.Dec. 368, 800 N.E.2d 436; Austin, 349 Ill.App.3d at 772-73, 285 Ill.Dec. 768, 812 N.E.2d 588. Because the statutes so evidently serve different purposes, the cross-comparison test for a proportionality violation is not appropriate here and we will not employ it. See James, 246 Ill.App.3d at 947, 186 Ill.Dec. 876, 617 N.E.2d 115; see, e.g., Austin, 349 Ill.App.3d at 773, 285 Ill.Dec. 768, 812 N.E.2d 588. Accordingly, we need not proceed to the second step of the cross-comparison analysis, namely, a determination of whether the offense with the harsher penalty is more serious than the offense with the less severe penalty. See Washington, 343 Ill.App.3d at 898, 279 Ill.Dec. 368, 800 N.E.2d 436.
Even were we to conclude that the two statutes do share a common statutory purpose and proceed to this second step, defendant would not succeed in his challenge. He asserts that, putting aside the differing mental states involved in each of these crimes as they have no impact on "public safety," which is the determining factor of this second step, the added element of reckless discharge requiring that the victim suffer actual endangerment of his "bodily safety" makes this a more serious offense than aggravated discharge, which does not require that the victim suffer harm of any sort. We wholeheartedly disagree.
The more serious offense here is the Class 1 felony of aggravated discharge, which is properly punished more severely than the Class 4 felony of reckless discharge. See 720 ILCS 5/24-1.2, 24-1.5 (West 2002). Setting aside the concept of mental states for the moment, contrary to defendant's argument, "threat to public health and safety" is not the only factor to be considered in determining the seriousness of an offense. See Garza, 298 Ill.App.3d at 462, 232 Ill.Dec. 734, 699 N.E.2d 181. Rather, the legislature may well choose to punish a particular crime more harshly for several other reasons, such as the frequency of its commission, the need to curb the increase of its commission, or the high risk of bodily harm associated with its commission. See Garza, 298 Ill.App.3d at 462, 232 Ill.Dec. 734, 699 N.E.2d 181. Here, there is a sufficient and solid rational basis for finding that aggravated discharge is a more serious offense than reckless discharge. One can easily conclude that it is more serious for an offender to shoot at/in the direction of someone than it is for the offender to simply go about town shooting a gun at no one in particular and indirectly endangering another's bodily safety; it is more likely that such direct action will result in more dire consequences and, hence, in a greater and defined risk of bodily harm. See, e.g., Austin, 349 Ill.App.3d at 772-73, 285 Ill.Dec. 768, 812 N.E.2d 588; Townsend, 275 Ill.App.3d at 419-20, 211 Ill.Dec. 286, 654 N.E.2d 1096; James, 246 Ill.App.3d at 947, 186 Ill.Dec. 876, 617 N.E.2d 115.
In addition, even though defendant is correct that the degree of harm to the public safety is a focal point of the second step in a cross-comparison analysis, it cannot be denied that the underlying mental states of the two offenses at issue are extremely relevant to this concern. After all, it is ultimately the mental state of an offense that may properly set it apart from an otherwise similar offense with a differing punishment. Indeed, varying mental states result in differing degrees of culpability. See People v. Higgins, 86 Ill.App.2d 202, 206, 229 N.E.2d 161 (1967). In the instant case, we are confronted with *819 an intentional/knowing offense (aggravated discharge) and a reckless offense (reckless discharge). A person acts knowingly or intentionally when he is "consciously aware" that the result is practically certain to be caused by his conduct or "his conscious objective" is to engage in that conduct to accomplish a particular result. 720 ILCS 5/ 4-4, 4-5 (West 2002). In contrast, a person acts recklessly when he simply "consciously disregards" a substantial risk that a result will follow. 720 ILCS 5/4-6 (West 2002). We have long held:
"[O]ffenses involving the mental state of `intent' or `knowledge' require[ ] a higher degree of mental culpability than an offense involving the mental state of `recklessness.' `Recklessness' is a mental state involving criminal liability of a degree below that of intent or knowledge. To act recklessly falls short of acting intentionally." Higgins, 86 Ill.App.2d at 207, 229 N.E.2d 161.
From this, it becomes clear that aggravated discharge is, contrary to defendant's argument, the more serious offense. Accordingly, as it is properly punished more severely than the lesser offense of reckless discharge, we fail to find support for a claim of unconstitutionally disproportionate penalties.

II. Wick and Overbreadth
Defendant's second contention on appeal in support of the outright reversal of his conviction is that, pursuant to the decision in People v. Wick, 107 Ill.2d 62, 89 Ill.Dec. 833, 481 N.E.2d 676 (1985), the aggravated discharge of a firearm statute is unconstitutional because it is overbroad. Within this substantive due process argument, he asserts that, because the statute fails to contain the phrase "without lawful authority" as part of its provisions, it inherently proscribes lawful conduct and fails to exclude innocent conduct, since thereunder a person lawfully defending himself using a firearm may be charged with aggravated discharge. We disagree.
Initially, we note that defendant is incorrect in his statement that the standard of review is de novo. To the contrary, when, as here, legislation is being challenged as failing to comply with substantive due process requirements, and that legislation does not involve a fundamental constitutional right, we must employ the rational basis test: whether the statute is "'"`reasonably designed to remedy the evils which the legislature has determined to be a threat to the public health, safety and general welfare.'"' [Citations.]" Austin, 349 Ill.App.3d at 770-71, 285 Ill.Dec. 768, 812 N.E.2d 588; accord People v. Grant, 339 Ill.App.3d 792, 803, 274 Ill.Dec. 304, 791 N.E.2d 100 (2003); In re F.M., 344 Ill.App.3d 524, 528-29, 279 Ill.Dec. 843, 801 N.E.2d 135 (2003). If the statute withstands this test, it must be upheld. See Grant, 339 Ill.App.3d at 803, 274 Ill.Dec. 304, 791 N.E.2d 100.
As noted, defendant cites primarily to Wick in support of his argument here. In Wick, the defendant challenged an aggravated arson statute on the grounds that it was not rationally related to its intended purpose because it could be applied to innocent conduct. That statute provided that a person committed aggravated arson when he knowingly damaged a building by fire and a fireman or police officer on the scene was injured. See Wick, 107 Ill.2d at 64, 89 Ill.Dec. 833, 481 N.E.2d 676. Our state supreme court held the statute to be unconstitutionally overbroad, finding that while its purpose was to subject arsonists to a more severe penalty when a fireman or police officer was injured as a result of their conduct, the actual statute was not reasonably related to this purpose because it did not require an unlawful purpose in *820 setting a fire, as the definition of simple arson did. See Wick, 107 Ill.2d at 66, 89 Ill.Dec. 833, 481 N.E.2d 676.
Defendant claims that, just as the aggravated arson statute in Wick, the failure of the aggravated discharge statute to contain the phrase "without lawful authority" renders it likewise unconstitutionally overbroad, setting forth the hypothetical situation in which someone discharges a weapon at another in self defense. However, the recent decision in People v. Folks, 273 Ill.App.3d 126, 134, 209 Ill.Dec. 838, 652 N.E.2d 378 (1995), held that under the aggravated discharge statute:
"[E]very one of the circumstances covered [therein] involves the firing of a firearm under circumstances which are extremely dangerous. That, of itself, is enough to justify [the statute.]"
Moreover, we note that while the phrase "without lawful authority" is absent from the aggravated discharge statute, we may, and do, nonetheless interpret the statute as proscribing only conduct performed "without lawful authority." This construction falls in line with the legislature's intent and purpose in enacting it (which we have already discussed at length) and avoids the possibility that the statute reaches innocent conduct. See People v. Bailey, 167 Ill.2d 210, 224, 212 Ill.Dec. 608, 657 N.E.2d 953 (1995) (employing same reasoning as used by our supreme court in similar analysis). In addition, we note that this interpretation is consistent with our cardinal rules of statutory construction: to give effect to the legislature's intent, to affirm a statute's validity and constitutionality if reasonable, and to reinforce the presumption that the legislature intended to validly interpret the statute. See Bailey, 167 Ill.2d at 225, 212 Ill.Dec. 608, 657 N.E.2d 953.
Given our interpretation, then, the aggravated discharge statute does not contain the same constitutional infirmity as the aggravated arson statute presented in Wick. We do not believe that the aggravated discharge statute, as the legislature laid out its provisions, involves any "innocent conduct." Rather, the discharge of a firearm at or into a building one knows to be occupied, or in the direction of another, or in the direction of a vehicle he knows to be occupied is, without doubt, criminal conduct. The statute's proscriptions are reasonably related to the goal of preventing offenders from shooting directly at or in the direction of their potential victims. See Bailey, 167 Ill.2d at 225-26, 212 Ill.Dec. 608, 657 N.E.2d 953; Austin, 349 Ill.App.3d at 771-72, 285 Ill.Dec. 768, 812 N.E.2d 588; see, e.g., Folks, 273 Ill.App.3d 126, 209 Ill.Dec. 838, 652 N.E.2d 378 (upholding validity of aggravated discharge statute pursuant to substantive due process challenge); James, 246 Ill.App.3d 939, 186 Ill.Dec. 876, 617 N.E.2d 115 (same). Accordingly, we fail to find support for defendant's claim of overbreadth.

III. Self-Defense Instruction
Defendant's final contention on appeal seeks an alternative to the outright reversal of his conviction. He asserts that his conviction must be reversed and remanded because the jury "was not given the opportunity" to consider whether his conduct was a legitimate exercise of self-defense. While he admits that he failed to argue self-defense, defendant claims that he should not be at fault for this omission because self-defense should have been considered an "element of the offense," the record indicates this was a properly applicable defense in the instant case, and a grave/plain error resulted when a self-defense instruction was not given to the jury. We disagree.
As defendant himself acknowledges, his failure to request a self-defense *821 instruction resulted in waiver of this issue on appeal. See People v. Bosek, 210 Ill.App.3d 573, 594, 155 Ill.Dec. 370, 569 N.E.2d 551 (1991) (failure to object at trial or in posttrial motion with respect to jury instructions amounts to waiver). While he insists that we review this issue under plain error, we note that we may employ such an analysis in only two limited circumstances: when the evidence is closely balanced or when a substantial right is affected. See People v. Wembley, 342 Ill.App.3d 129, 138, 277 Ill.Dec. 382, 796 N.E.2d 97 (2003) (plain error rule permits consideration of errors even though technically waived for review); see also 134 Ill.2d R. 615(a).
First, we find that the evidence in this case was not closely balanced. Ruiz testified that defendant followed him through the neighborhood streets and continuously rammed his car into Ruiz's car and that defendant's passengers were shooting at him, thus causing him to lose control of his car. When Ruiz began to run down the alley, defendant's passengers continued to shoot at him, and defendant waited for them to jump back into his car before driving away from the scene. Officer Glaviano corroborated this, as he testified that at all times during the chase, defendant's car was behind Ruiz's, ramming it. Officer Glaviano saw defendant's passengers shooting at Ruiz's car and at Ruiz as he ran away. Officer Glaviano also saw defendant allow Lopez to re-enter his car after the shooting so they could drive away from the scene. The rear of Ruiz's car corroborated this testimony: there were ram marks on the rear bumper and bullet holes in the back frame and the back windshield was shot out. Officer Roman testified that he was present as defendant drove around a barricade so Lopez could discard the weapon used, as defendant collided head-on with a police car, injuring an officer, and as defendant immediately exited his vehicle and began to run in a continued effort to evade police.
Second, we do not find that defendant's substantial rights were affected or that justice requires our review of this waived issue. Rather, based on the record and circumstances present, any error that may have resulted from the omission of a self-defense instruction to the jury amounted only to harmless error. An error in jury instruction is considered harmless if the result would not have been different had a proper instruction been given. See People v. Furdge, 332 Ill.App.3d 1019, 1026, 266 Ill.Dec. 309, 774 N.E.2d 415 (2002); People v. Mercado, 333 Ill.App.3d 994, 999-1000, 267 Ill.Dec. 838, 777 N.E.2d 641 (2002). In determining whether the error is harmless, we must examine first whether any error occurred and, if so, then whether, in spite of this error, evidence of defendant's guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt. See Furdge, 332 Ill.App.3d at 1032, 266 Ill.Dec. 309, 774 N.E.2d 415 ("a jury instruction error does not require reversal if the evidence that supports the conviction is so clear and convincing that the verdict would not have been different"). We view the instruction at issue in light of the facts before us and all the evidence presented at trial. See Furdge, 332 Ill.App.3d at 1032, 266 Ill.Dec. 309, 774 N.E.2d 415.
Initially, we note that self-defense is not part of the aggravated discharge statute. In fact, it specifically has been declared that the failure of this statute to take into account self-defense as an exception to its provisions is not improper and does not invalidate the statute. See James, 246 Ill.App.3d at 949, 186 Ill.Dec. 876, 617 N.E.2d 115. Thus, there would have been no legal reason to provide the jury here with a self-defense instruction. Moreover, *822 defendant has failed to show how the outcome of his trial would have been different had the jury received a self-defense instruction. There is no indication, as he contends, that because the jury acquitted him on the first degree murder charges it also would have done so on the aggravated discharge charges had such an instruction been given.
Most significantly, the record belies defendant's insistence that a self-defense instruction would have been proper here. Rivera, who was in the car with defendant during the incident, testified that he never saw Ruiz shoot a gun at defendant's car. In fact, Rivera admitted that he did not believe defendant's back window was shot out during the chase. Similarly, Diaz DeLeon testified that she did not see Ruiz shoot at them. Defendant himself testified that the bullet holes in the frame of the rear of his car came, not from Ruiz, who he alleged was following him, but rather, from Lopez, who defendant admitted had turned around to shoot at Ruiz during the chase. In addition, it is clear from the record that defendant in no way attempted to raise a claim of self-defense at any point throughout his trial. Rather, it is undisputable that his theory of the case was that he was not accountable for the actions of Lopez and Brito, i.e., that he was not part of a plan or scheme to open fire on Ruiz, that this was a spontaneous action he knew nothing about and did not sanction, and that he was merely in the wrong place at the wrong time behind the wheel of his car. Several instances present in the record confirm that defendant never alluded to a fear for his safety in response to Ruiz's actions. These include defendant's opening statement wherein he discussed that the State was trying to hold him accountable for the actions of Lopez and Brito and informed the jury that he would "argue * * * that the connection * * * does not exist"; defendant's examination of his witnesses, which included multiple questions reflecting whether defendant "direct[ed] anyone to shoot anyone"; and a closing argument filled with comments to the jury with respect to accountability, the alleged "spontaneity" of the incident, the admission that Ruiz did not fire any shots at defendant's car at any time during the chase, and the insistence that the only "criminality" on the part of defendant in this case was speeding, eluding police and leaving the scene of an accident.
Accordingly, we fail to see the applicability of a self-defense instruction to the instant case and, thus, fail to find support for defendant's contention that his conviction must be reversed and remanded due to its absence.

CONCLUSION
For all the foregoing reasons, we affirm the judgment of the trial court.
Affirmed.
FROSSARD, P.J., and TULLY, J., concur.